# United States Court of Appeals
# For the First Circuit

————————————

No. 01-2133

LARKIN D. WATSON IV,

Plaintiff, Appellant,

v.

DEACONESS WALTHAM HOSPITAL, CAREGROUP, INC., LIBERTY LIFE
ASSURANCE CO. OF BOSTON,

Defendants, Appellees.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

————————————

Before

Torruella, Circuit Judge,
Bownes, Senior Circuit Judge,
and Lynch, Circuit Judge.

————————————

Robert LeRoux Hernandez for appellant.

Philip M. Cronin with whom Joseph K. Scully and Peabody &
Arnold LLP were on brief for appellee.

————————————

August 8, 2002

————————————

**LYNCH**, **Circuit Judge**.  Larkin Watson, fifty-six years old and totally disabled due to a heart condition, is unemployed and not receiving Long Term Disability (LTD) benefits.[1]  He claims that, at pertinent times when he would have been eligible for LTD coverage through his employer, he was never told of the eligibility.  As a result, he made choices about the number of hours he worked, not understanding that a consequence of his choices was that he was no longer eligible for LTD coverage.  By the time that Watson says he did learn of the LTD policy and submitted his application, that application was denied on a number of grounds; had he applied earlier and made different choices, he says he would have been given the LTD benefits he now needs.  Watson sued his employers and plan administrators under the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461 (2000).

Watson does not sue the Plan for denial of benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); there would be obvious problems in doing so.  Rather, he attempts to fit his claim into the particular circumstances in which benefits plan participants and beneficiaries may bring claims alleging breach of fiduciary duty by plan administrators and others.  See, e.g., Varity Corp. v. Howe, 516 U.S. 489 (1996).

---

[1]    After we heard oral argument but before this decision issued, plaintiff Larkin Watson died.  Pursuant to Fed. R. App. P. 43(a)(1), his widow, Lyndsey Watson, was substituted as the plaintiff.  For purposes of convenience, we refer to the plaintiff as Larkin Watson.

The district court granted judgment for Deaconess Waltham Hospital, Watson's employer, Watson v. Deaconess Waltham Hosp., 141 F. Supp. 2d 145 (D. Mass. 2001), declined to allow Watson to amend his complaint to add previous plan administrators as defendants, Watson v. Deaconess Waltham Hosp., No. 00-10583-WGY (D. Mass. June 1, 2001), and also granted summary judgment for the Liberty Life Assurance Co. of Boston, the LTD insurer after January 1, 1996, Watson v. Deaconess Waltham Hosp., No. 00-10583-WGY (D. Mass. June 29, 2001). We affirm the district court's decisions, although our reasoning differs in some respects.

We summarize the heart of our reasoning. ERISA does require plan administrators to provide certain benefits plan information, such as Summary Plan Descriptions, to all plan participants and beneficiaries. 29 U.S.C. § 1024(b). ERISA also provides limited and specific remedies if an administrator fails to do so. Id. at § 1132(a)(1), (c)(1)(B). When ERISA itself has specified a duty and a corresponding remedy, we will impose a further duty on fiduciaries only in very narrow circumstances. Even assuming Deaconess was a fiduciary, Watson has not presented facts that fit him into those narrow circumstances. This is not a case in which misrepresentations were made to Watson, nor is this a case in which he requested the LTD information and the response was inadequate.

I.

The facts are largely undisputed. The parties agreed that the district court judge should consider the case against

-3-

Deaconess as a case stated. See Cont'l Grain Co. v. P.R. Mar. Shipping Auth., 972 F.2d 426, 429 n.7 (1st Cir. 1992). The case against the insurer was resolved on summary judgment.

Larkin Watson first began working for Waltham-Weston Hospital, the predecessor to Deaconess Hospital, in October 1992, as a part-time employee working twenty-four hours per week as an Addictions Counselor. During the orientation on his first day of work, Watson reviewed and signed an "Employee Orientation Checklist," which included a list of possible benefits. Several of the benefit programs are checked off, and others have notations such as "not interested" or "gave info -- will decide." On the line for the LTD Insurance program is the notation "N/A." Watson testified in his deposition that he did not know what "LTD Insurance" meant and that the human resources representatives simply told him that it did not apply to him. Watson was also given a two-page "Part Time Employee Benefits Summary" listing the conditions under which part-time employees became eligible for various types of benefits; LTD benefits were not listed or discussed on this form. At that time, the hospital's LTD insurance plan was provided through the Confederation Life Insurance Company (not a party to this action) and required that an employee work at least thirty-six hours per week in order to be eligible. All parties agree that Watson was not eligible for LTD plan participation when he began his employment in October 1992.

On November 5, 1993, Watson changed his employment status. According to an affidavit of the hospital's Director of

Human Resources, Watson became a "full-time" Addictions Counselor at that time.  In a letter offering him the full-time position, Watson's supervisor wrote, "[F]ull-time benefits will be available to you.  Please discuss these issues with the representative from human resources."[2]  Watson says that he discussed the "benefits of the new full-time job" with the Assistant Director of Human Resources and the Human Resources Benefits Coordinator and that, at that time, he opted to enroll in the major medical and dental plans.  Watson says that no one informed him that, as a full-time employee, he was eligible for LTD benefits, nor was he given any summary plan description or other notice of benefits.  The hospital's LTD plan was an employer-pay-all plan, under which Watson automatically became a beneficiary because he was a full time employee working at least thirty-six hours per week; no action was required on his part to enroll.

In late 1995, Watson began having health problems related to a heart condition and, as a result, began missing days at work.  In early 1996, his supervisor, Lynne Foster, had several conversations with him, asking him if he would like to reduce his hours to part-time work, because she believed that he was having trouble keeping up with full-time work due to his health condition.  Watson says that these conversations "induced" him to change his status to part-time employment at thirty-two hours per week,

_____

[2]    According to Deaconess's Director of Human Resources, the hospital has since instituted a policy of sending any employee who changes from part-time to full-time status, or vice versa, a letter explaining any changes in his or her benefits.

-5-

effective on March 17, 1996. Again, no one informed him that there could be changes in his benefits eligibility as a result of this change. Watson says that he contacted someone in Human Resources to ask how the change would affect his major medical and dental benefits, but that he never requested a listing of benefits for which he was or would be eligible. Nor did he ask anyone about any disability benefits.

For the next three years, Watson worked as a part-time employee. Between June 1998 and February 1999, Watson repeatedly requested a return to full-time employment. He says that he first became aware of the existence of the LTD policy on about February 3, 1999, when he learned of the policy from a Human Resources employee. On March 29, 1999, he returned to full-time work, but his medical condition apparently deteriorated. On or about April 28, 1999, his doctor informed the hospital that Watson was totally disabled and would be unable to return to work because of his heart condition. As a result, in 1999, Watson was a full-time employee for less than a month.

On July 28, 1999, after the expiration of the LTD policy's ninety-day "elimination period" (a waiting period after the onset of the disability before benefits will be paid), Watson submitted a disability claim form to Liberty Life Assurance. Liberty had taken over as carrier of Deaconess Waltham's LTD policy as of January 1, 1996, and Deaconess Waltham had renewed the policy with Liberty effective January 1, 1998. Watson's claim was denied on November 19, 1999 because Liberty determined that Watson's

disability was due to a condition that predated his plan enrollment.[3]

When Watson returned to full-time work in March 1999, the hospital and Liberty agreed to waive the standard six-month waiting period for plan eligibility; otherwise, Watson would not have been covered by the plan at all after only a month's worth of full-time employment. After determining that Watson's April 1999 disability was barred by the preexisting condition clause, Liberty also considered whether Watson was disabled as of December 29, 1995, when he was first hospitalized for his heart problems. Liberty determined that a claim based on a December 29, 1995, disability onset date must be denied because: (1) although Watson was scheduled to work forty hours per week in December 1995, his time cards indicated that he worked only 32 hours per week in the three weeks prior to December 29 and was therefore not eligible as a full-time employee;[4] (2) any claim based on a December 29, 1995

---

[3]     Under the Confederation Life Insurance Policy, in effect when Watson first became a full-time employee, preexisting conditions were covered if the employee had been actively at work and insured for twelve consecutive months. The Northwestern Mutual policy did not cover preexisting conditions, but did have a grandfather clause covering preexisting conditions if the applicant had been covered by the Confederation policy. The Liberty Life Assurance policy covered preexisting conditions if the individual was insured under the Northwestern Mutual policy and was in active employment and insured as of January 1, 1995. Therefore, it appears that if Watson had maintained his eligibility, he would not have had a problem concerning the onset date of his heart condition.

[4]     The hospital suggested at oral argument that Watson was never eligible for the LTD plan, as he worked fewer than thirty-six hours per week. Watson concedes that sometime after November 26, 1995, his hours fell below thirty-six hours per week. There does not appear to be any evidence that Watson was not covered by the

-7-

disability should have been filed by April 28, 1997; and (3) evidence showed that Watson's condition improved and he was not disabled after December 29, 1995. Watson appealed Liberty's decision, and Liberty again denied his claim. Watson filed this federal lawsuit on March 27, 2000.

During the course of Watson's employment, a series of different LTD policies was in effect. We outline the policies here, and attach an Appendix for further clarification.

When Watson began working for the hospital, the LTD carrier was Confederation, and the hospital (then Waltham-Weston Hospital) functioned as the plan administrator. On November 1, 1994, Northwestern Mutual Life Insurance Company became the carrier for the hospital's LTD plan. This plan remained in effect until January 1, 1996. The plan administrator under this Northwestern Mutual policy was the hospital's Human Resources Director, Fred

_____

plan between November 5, 1993, and November 26, 1995. The evidence in the record shows that Watson worked at least thirty-six hours during most weeks in 1995. At his deposition, Watson testified that his position was a forty hour per week position, although he admitted that from January to March of 1996 he was working far fewer hours due to his heart condition. In addition, the Human Resources Director, Fred Sussman, apparently told Watson at some point that he was eligible for the LTD policy from November 5, 1993, until March 17, 1996. Watson's argument is that he would have acted differently had he known of his eligibility for LTD coverage as a full-time employee; the fact that he allowed his hours to slip below the coverage minimum at some point prior to changing to part-time employment status does not undercut this argument. If he would have refused part-time employment in order to maintain his eligibility, presumably he would have also made sure he did not let his hours drop. Moreover, the Northwestern policy, in effect during 1995, may have covered Watson even if his hours dropped below thirty-six hours. The policy defines an employee as "an active part-time or full-time employee . . . regularly scheduled to work on at least a 36-hour-per-week basis . . . ." (emphasis added).

Sussman. Effective February 1, 1995, the hospital was bought by Pathway Health Network (Pathways) and became the Deaconess Waltham Hospital;[5] the hospital's Human Resources Director, Sussman, continued as the plan administrator. On January 1, 1996, Liberty Life Assurance became the carrier for the LTD policy.[6] The hospital's parent company (first Pathways and then, after October 1, 1996, Caregroup) was the named sponsor and plan administrator under the Liberty Life Assurance policy. Effective January 1, 1998, a new LTD policy came into effect, also carried by Liberty Life Assurance and also with Caregroup as the plan administrator.

II.

A. Standards of Review

On appeal, Watson argues that, if he had known of the LTD policy and his eligibility for it, he would have taken steps in 1995 and 1996 to ensure his continued eligibility or he would have applied for partial disability benefits at that time. He argues that his subsequent ineligibility was the result of the hospital's and the insurer's failure to inform him. This, he says, violated

_____

[5] Deaconess has admitted that it assumed the assets and liabilities of Waltham-Weston Hospital.

[6] Watson has argued that the Liberty policy was in effect during 1995; his only support for this is a copy of the policy stating that its effective date is January 1, 1995. The district court found, however, that the effective date written in the policy referred to other Pathways hospitals, covered by the same LTD policy, and that the Liberty policy did not take effect at Waltham Deaconess until January 1, 1996. The defendants have introduced evidence to support this finding, and Watson has not introduced anything to convince us that the district court's finding is clearly erroneous.

-9-

the hospital's fiduciary duty under ERISA, 29 U.S.C. § 1104(a), or, in the alternative, violated ERISA's "catch all" provision, id. § 1132(a)(3). Second, and for the same reasons, he argues that the district court erred in dismissing his complaint for failure to state a claim against Caregroup, the hospital's parent company, which was designated as the plan administrator under the Liberty Life Assurance policy.

Third, he argues that the district court abused its discretion in refusing to allow him to amend his complaint to add the Human Resources Director and Pathways, the predecessor to Caregroup, as defendants.

Finally, he argues that the district court erred in granting summary judgment to Liberty because Liberty was a necessary party for full relief, discovery was needed to ascertain Liberty's role in failing to inform Watson, and the complaint against Liberty was timely.

Watson and defendant Deaconess Waltham agreed to have the district court decide their cross-motions for summary judgment as a case stated. We review de novo a district court's legal conclusions in a case stated, but its factual findings, and any inferences that the court drew from the stipulated facts, are subject to only clear error review. See United Paperworkers Int'l Union v. Int'l Paper Co., 64 F.3d 28, 31-32 (1st Cir 1995). Watson can prevail on appeal against Deaconess only if he shows that the district court's factual determinations are clearly erroneous or if the district court made an error of law.

We review the district court's grant of Liberty Life Assurance's summary judgment motion and Caregroup's motion to dismiss de novo, making all reasonable factual inferences in favor of Watson. Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002); Martin v. Applied Cellular Tech., Inc., 284 F.3d 1, 5-6 (1st Cir. 2002).

As for the denial of Watson's motion to amend his complaint to add additional defendants, we typically review the district court's denial of a motion to amend a complaint for abuse of discretion, keeping in mind Rule 15(a)'s mandate that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); see Hatch v. Dep't for Children, Youth & their Families, 274 F.3d 12, 19 (1st Cir. 2001). "If, however, leave to amend is not sought until after discovery has closed and a summary judgment motion has been docketed, the proposed amendment must be not only theoretically viable but also solidly grounded in the record [and] . . . supported by substantial evidence." Hatch, 274 F.3d at 19. Therefore, we will review the district court's denial of the motion to amend under the substantial evidence standard of review.

## B. Breach of Fiduciary Duty

ERISA issues can be enormously complicated and this case, in theory, raises at least half a dozen abstruse issues. In the end, the outcome turns on the question of whether there was any breach of any fiduciary duty by Deaconess in any of its ERISA roles

-11-

vis-à-vis Watson. We will streamline the analysis and make certain preliminary assumptions and rulings in Watson's favor.

The case concerns three different time periods when duties were possibly owed to Watson: when he took full-time status in 1993; when he had discussions with Waltham Deaconess about his health condition and work hours in 1995-96; and when he took part-time status in 1996. Watson asserts two different types of claims: first, that there was an absolute fiduciary duty, redressable by this action, to provide him with the LTD benefits information and, second, that, even if his first claim fails, once he made a general inquiry about benefits, there was a duty of disclosure of the LTD plan's existence and terms.

These claims need to be understood in context. Watson's complaint did not allege a cause of action against the plan itself. This is not an action against a plan for a wrongful denial of benefits,[7] but against an alleged fiduciary for breaching its duty, invoking the catchall provisions of 29 U.S.C. § 1132(a)(3).

ERISA provides that those who act as fiduciaries have certain duties with respect to welfare plan participants and beneficiaries. A fiduciary must, among other things, follow a "prudent man standard of care":

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar

---

[7] That may be because he was not eligible for benefits based on his heart condition when he finally applied, due to the preexisting condition limitation.

with such matters would use in the conduct of an enterprise of a like character and with like aims.

Id. § 1104(a)(1). A fiduciary may be liable to the plan for violations of this duty. Id. § 1109; see Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134 (1985).

In addition, an individual plan participant or beneficiary may bring suit for equitable relief for breach of fiduciary duty under ERISA's so-called "catch all" provision, which states that:

> A civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

29 U.S.C. § 1132(a)(3) (1994); see Varity Corp., 516 U.S. at 509-15. The Supreme Court has interpreted § 1132(a)(3) as "a safety net, offering appropriate equitable relief for injuries caused by violations that [29 U.S.C. § 1132] does not elsewhere adequately remedy."[8] Varity Corp., 516 U.S. at 512.

---

[8] Deaconess argues that Watson's claim is not equitable, claiming that he essentially is seeking money damages. This court has recently noted the uncertainty surrounding whether a claim for reinstatement of beneficiary status or equitable restitution of past due benefits can be classified as a request for equitable relief or a request for money damages, Barrs v. Lockheed Martin Corp., 287 F.3d 202, 206 (1st Cir. 2002), particularly in light of the recent Supreme Court holding in Great-West Life & Annuity Insurance Company v. Knudson, 122 S. Ct. 708 (2002). In Great-West Life, the Supreme Court held that § 1132(a)(3) relief is available only in cases that follow the historical model for cases brought at equity. It stated that "[a]lmost invariably . . . suits seeking . . . to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' . . . since they seek no more than compensation for loss resulting from the defendant's breach of legal duty," id. at 713 (quoting Bowen v. Massachusetts, 487 U.S.

-13-

Deaconess urges us to dispose of this case on the grounds that it was not a fiduciary at any pertinent time. For the first time period, in 1993 when Watson had full-time status, Deaconess had no relationship with Watson: he worked for Waltham-Weston Hospital, not Deaconess. The district court reasoned that Watson would have to overcome ERISA's section 409(b), 29 U.S.C. § 1109(b), in order to impute any liability on the part of Weston-Waltham for events in 1993 to Deaconess. Watson, 141 F. Supp. 2d at 149. Section 409(b) states that a successor fiduciary does not, in that capacity, assume liability for breach of fiduciary duty of an earlier fiduciary.[9] The district court's analysis was misplaced.

879, 918-19 (1988) (Scalia, J., dissenting)), and that suits for restitution were ordinarily only available "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." Id. at 714. It is not yet clear how the line of precedent from our sister circuits indicating that restitution and reinstatement are equitable remedies under § 1132(a)(3), see, e.g., Griggs v. E.I. Dupont De Nemours & Co., 237 F.3d 371, 384 (4th Cir. 2001); Bowerman v. Wal-Mart Stores, Inc., 226 F.3d 574, 592 (7th Cir. 2000), will be affected by Great-West. Compare Ross v. Rail Car Am. Group Disability Income Plan, 285 F.3d 735, 740-411 & n.7 (8th Cir. 2002) (plaintiff seeking declaration that plan amendments were void and restoration of full benefits under original plan presented equitable claim under § 1132(a)(3)), with Kishter v. Principal Life Ins. Co., 186 F. Supp. 2d 438, 445 (S.D.N.Y. 2002) (beneficiary's claim for insurance money she claimed she would have received if not for fiduciary's breach of duty was foreclosed by Great-West). Because we decide this case for the defendants on other grounds, we need not decide whether Great-West would preclude the type of relief Watson seeks.

[9] The subsection's language is as follows:

No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

29 U.S.C. § 1109(b).

-14-

Nothing in section 409(b) precludes a later fiduciary from assuming by contract the ERISA obligations of a former fiduciary. The district court never ruled on this contract question. The evidence[10] does seem to show that Deaconess assumed by contract any liability incurred by Waltham-Weston, including Waltham-Weston's liability as the plan administrator and fiduciary.

During the 1995 period, the Human Resources Director of Deaconess, Fred Sussman, was the named plan administrator. Whether that makes Deaconess a fiduciary depends on the answer to several questions: (1) whether Watson has shown that Deaconess was responsible for Sussman's ERISA activities; (2) whether the facts of that responsibility made Deaconess a plan administrator;[11] (3) whether a plan administrator is per se a fiduciary,[12] or whether

---

[10] The only evidence in the record on this point is deposition testimony from Sussman, the Human Resources Director, who said that Deaconess Waltham assumed the assets and liabilities of Waltham-Weston Hospital as part of the February 1995 purchase.

[11] See, e.g., J.F. Jordan, et al., Handbook on ERISA Litigation § 3.02[B], at 3-33 (2d ed. 2001) ("[F]iduciary status with respect to the administration or management of the plan may arise from the . . . employer's exercise of the responsibilities of the plan administrator although the employer has not been so formally designated, or from the employer's exercise of de facto control over the plan administrator or other parties responsible for the management of the plan." (footnotes omitted)).

[12] We have previously proceeded on the assumption that a plan administrator is a fiduciary. See, e.g., Barrs, 287 F.3d at 206 ("Lockheed, as the named administrator of the plan, is a fiduciary under ERISA."); see also UAW v. Skinner Engine Co., 188 F.3d 130, 148 (3d Cir. 1999) ("The law in this circuit instructs that 'when a plan administrator explains plan benefits to its employees, it acts in a fiduciary capacity.'" (quoting In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig., 57 F.3d 1255, 1261 n.10 (3d Cir. 1995)); Canada Life Assurance Co. v. Estate of Lebowitz, 185 F.3d 231, 237 (4th Cir. 1999) ("By the very nature of the position, a plan administrator is a fiduciary with respect to her

-15-

instead a functional test should be applied even to plan administrators to decide whether they are fiduciaries;[13] and (4) whether, if a functional test must be applied, Sussman's functions bring Deaconess into that fold. We need not decide here whether Deaconess bears a fiduciary responsibility by virtue of Sussman's functions.

The question at the heart of this case is what was the extent of Deaconess's fiduciary obligations, if any, and whether it failed to meet its obligations. Reduced to its essence, Watson's claim is that the hospital violated its fiduciary obligation by not informing him of the existence of the LTD plan or giving him the proper plan documents when he was eligible for the plan, and by not mentioning the loss of LTD eligibility when he made the change to part-time employment in March 1996, particularly when he asked someone in Human Resources how the change would affect his medical and dental benefits. This brings together two related strands of ERISA cases: those involving plaintiffs seeking substantive remedies, such as reinstatement or retroactive benefits, based on a fiduciary's failure to comply with ERISA's technical notice and disclosure requirements; and those involving a fiduciary's failure

---

own policy."); Bd. of Trs. of the CWA/ITU Negotiated Pension Plan v. Weinstein, 107 F.3d 139, 141 (2d Cir. 1997) ("[T]he Department of Labor['s guidance] interpreting ERISA make clear that the administrator and trustees of a pension plan are fiduciaries within the meaning of the statute . . . .").

[13] See Harris Trust & Sav. v. Provident Life & Accident Ins. Co., 57 F.3d 608, 613-14 (7th Cir. 1995); Kyle Rys. v. Pac. Admin. Servs., 990 F.2d 513, 516 (9th Cir. 1993); Baker v. Big Star Div. of the Grand Union Co., 893 F.2d 288, 290 & n.2 (11th Cir. 1990); Boucher v. Williams, 13 F. Supp. 2d 84, 91 (D. Me. 1998).

to communicate information relevant to the beneficiary's employment decisions. Watson relies primarily on the latter, while the defendants rely primarily on the former. Both must be considered in order to assess Watson's claim.

1. Failure to comply with ERISA notice requirements

ERISA contains specific sections requiring plan administrators to provide participants with information, including a summary plan description. 29 U.S.C. §§ 1021, 1024. Plan participants have a cause of action under 29 U.S.C. § 1132(a)(1)(A) against plan administrators who fail to comply with a request to provide any such information. Section § 1132(c)(1)(B) specifies the relief available to such plaintiffs, allowing for penalties of $100 per day and "such other relief as [the court] deems proper." These penalties are limited, however, as the court may only order relief if the plan administrator fails to provide the appropriate documentation within thirty days after a participant requests it. Id. Watson did originally bring a claim under this subsection, but the district court granted summary judgment for Deaconess on this claim, because Deaconess supplied Watson with the most recent plan documentation when he first requested it in 1999. That ruling is not at issue in this appeal.

Watson tries to side-step this limitation by saying he now relies only on the equitable relief provision in § 1132(a)(3). The side-step does not work:

> [W]here ERISA itself specifies a notice requirement, courts must be especially cautious in creating additional ones.

-17-

> Absent a promise or misrepresentation, the courts have almost uniformly rejected claims by plan participants or beneficiaries that an ERISA administrator has to volunteer individualized information taking account of their peculiar circumstances. This view reflects ERISA's focus on limited and general reporting and disclosure requirements, and also reflects the enormous burdens an obligation to proffer individualized advice would inflict on plan administrators. In general, increased burdens necessarily increase costs, discourage employers from offering plans, and reduce benefits to employees.

Barrs v. Lockheed Martin, 287 F.3d 202, 207-08 (1st Cir. 2002) (holding that there was no fiduciary breach in failure to provide information to beneficiary not entitled to information under § 1024(b)(1)) (footnotes and citations omitted).

The Supreme Court has held that, although § 1132(a)(3) is a "catch all" remedy, relief is not "appropriate" within the meaning of this subsection "where Congress elsewhere provided adequate relief for a beneficiary's injury" and there is "no need for further equitable relief." Varity Corp., 516 U.S. at 512, 515.[14] The Court has repeatedly emphasized that "ERISA is a '"comprehensive and reticulated statute,"'" Great-West Life & Annuity Ins. Co. v. Knudson, 122 S. Ct. 708, 712 (2002) (quoting Mertens v. Hewitt Assocs., 508 U.S. 248, 251 (1993) (quoting Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 361 (1980))), and the Court has "therefore been especially 'reluctant to tamper with [the] enforcement scheme' embodied in the statute by

---

[14] The Court has further clarified that "Varity Corp. did not hold . . . that § 502(a)(3) is a catchall provision that authorizes all relief that is consistent with ERISA's purposes and is not explicitly provided elsewhere." Great-West, 122 S.Ct. at 719 n.5.

-18-

extending remedies not specifically authorized by its text," id. (quoting Russell, 473 U.S. at 147) (alteration in original).

This court and our sister circuits have taken a narrow approach towards ERISA plaintiffs who attempt to assert procedural notice and disclosure violations outside the context of § 1132(c). We have previously held, in the context of a § 1132(a)(1)(B) denial of benefits claim, "that ERISA's notice requirements are not meant to create a system of strict liability for formal notice failures," and a plaintiff must show prejudice in order to claim relief. Terry v. Bayer Corp., 145 F.3d 28, 39 (1st Cir. 1998); see also Govoni v. Bricklayers, Masons & Plasterers, 732 F.2d 250, 252 (1st Cir. 1984) ("Case law suggests . . . that to secure relief, Govoni must show some significant reliance upon, or possible prejudice flowing from, the faulty plan description.").

Technical violations of ERISA's notice provisions generally do not give rise to substantive remedies outside § 1132(c) unless there are some exceptional circumstances, such as bad faith, active concealment, or fraud. See, e.g., Panaras v. Liquid Carbonic Indus. Corp., 74 F.3d 786, 789 (7th Cir. 1996) (no remedy under § 1132(a)(1)(B) for technical violations, absent exceptional circumstances such as bad faith, concealment, or induced reliance); Ackerman v. Warnaco, Inc., 55 F.3d 117, 124-25 (3d Cir. 1995) (substantive remedies are not available for violation of reporting requirements absent extraordinary circumstances such as bad faith or active concealment); Kreutzer v. A.O. Smith Corp., 951 F.2d 739, 743-45 (7th Cir. 1992) (holding

that technical violations only warrant a benefits award in cases of bad faith, concealment or unfair administration). One of the few cases to award substantive remedies for a technical disclosure violation, Blau v. Del Monte Corporation, 748 F.2d 1348 (9th Cir. 1985), involved a situation where the employer actively concealed its benefits policy from most employees for several years, id. at 1351-52.

These cases, concerned mostly with denial of benefits claims under 29 U.S.C. § 1132(a)(1)(B), do not necessarily dispose of a fiduciary breach claim under § 1132(a)(3), see Jordan v. Federal Express Corp., 116 F.3d 1005, 1010-14 (3d Cir. 1997) (finding fiduciary breach for technical violation but no claim under § 1132(a)(1)(B)), but they are instructive. The Fifth Circuit, at least, has pursued a similarly narrow approach with regards to alleged fiduciary breaches arising out of technical violations, holding that a "[f]ailure to fulfill procedural requirements [of notice] . . . does not give rise to a substantive damage remedy [for fiduciary breach] . . . except[ ] . . . when the violations are continuous and amount to substantive harm." Hines v. Mass. Mut. Life Ins. Co., 43 F.3d 207, 211 (5th Cir. 1995). These notice and disclosure cases indicate, at a minimum, that a technical violation in and of itself cannot be considered a fiduciary breach. Rather, some other circumstance must be present.

The Supreme Court has cautioned that we must be mindful of the "competing congressional purposes [behind ERISA], such as Congress' desire to offer employees enhanced protection for their

-20-

benefits . . . and . . . its desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place."  Varity Corp., 516 U.S. at 497.

In this case, there were no extraordinary circumstances indicating that the fiduciary breached its duty.  Deaconess did not actively conceal its policy, and there are no allegations that it regularly failed to comply with notice requirements.  To the contrary, the hospital had an annual "benefit fair," scheduled for the open enrollment period, which all of the benefits carriers attended in order to answer employees' questions.  Further, new employees regularly received a checklist of benefits for which they were eligible.  Indeed, Watson was given a sheet indicating that he was not eligible for LTD insurance as a part-time employee.  There was no evidence that the hospital acted in bad faith.  It appears that Watson simply slipped through the cracks in this system when he switched from part-time to full-time employment status, an unfortunate occurrence but not bad faith, concealment, or fraud.

2. Failure to communicate information relevant to employment decision

Watson also argues that, apart from the failure to inform him of the LTD Plan when he started full-time employment in November 1993, he should have been informed of the consequences of his employment decision in the course of the discussions about his returning to part-time status, particularly his discussions about benefits in 1995-96.

-21-

There is little evidence about those discussions. Watson's deposition testimony is as follows:

> Question: In March of 1996 when you decided to go on a part-time basis did you discuss with [your supervisor] the effect of going on part time on your benefits?
>
> Answer: Well, I believe that I would have thought she wouldn't know and that I called Human Resources as to how it affected major medical and Delta Dental.
>
> Question: Did you do that?
>
> Answer: I believe so.

The Supreme Court in Varity Corp. specifically reserved the question of "whether ERISA fiduciaries have any fiduciary duty to disclose truthful information on their own initiative, or in response to employee inquiries." 516 U.S. at 506. Many of our sister circuits have held that, in certain circumstances, a fiduciary has an obligation to accurately convey material information to beneficiaries, including material information that the beneficiary did not specifically request.[15] See Griggs v. E.I. Dupont De Nemours & Co., 237 F.3d 371, 380-81 (4th Cir. 2001); Bowerman v. Wal-Mart Stores, Inc., 226 F.3d 574, 590 (7th Cir. 2000); Harte v. Bethlehem Steel Corp., 214 F.3d 446, 452 (3d Cir.),

---

[15]   In Vartanian v. Monsanto Co., 131 F.3d 264 (1st Cir. 1997), we noted, but did not decide, the question of whether a fiduciary has an affirmative duty to inform beneficiaries of information when the beneficiary has not specifically inquired. Id. at 268 n.4. Vartanian involved a plaintiff who inquired about the possibility of a retirement incentive package. Id. at 266. We held that a fiduciary only has a responsibility to disclose the possibility of an upcoming package if the package is under "serious consideration." Id. at 268. The problem in Vartanian was that the employee was requesting prospective information, about an event that might or might not come to pass. This is a different question than the question of when a fiduciary has a duty to disclose information about plans already in existence.

cert. denied, 531 U.S. 1037 (2000); Krohn v. Huron Mem'l Hosp., 173 F.3d 542, 547-48, 550 (6th Cir. 1999); Barker v. Am. Mobil Power Corp., 64 F.3d 1397, 1403 (9th Cir. 1995); Eddy v. Colonial Life Ins. Co., 919 F.2d 747, 750-52 (D.C. Cir. 1990).

There are two limitations on the imposition of an affirmative fiduciary duty to inform beneficiaries of material facts about the plan. First, a duty only arises if there was some particular reason that the fiduciary should have known that his failure to convey the information would be harmful. See, e.g., Griggs, 237 F.3d at 381-82 (fiduciary learned that employee's planned rollover election was not possible under tax code, but failed to inform him); Barker, 64 F.3d at 1402-03 (fiduciary suspected plan mismanagement and failed to inform beneficiaries); Eddy, 919 F.2d at 749 (plaintiff inquired about continuation rights for health insurance and fiduciary failed to inform him of conversion rights). A failure to inform is a fiduciary breach only where the fiduciary "knew of the confusion [detrimental to the participant] generated by its misrepresentations or its silence." UAW v. Skinner Engine Co., 188 F.3d 130, 148 (3d Cir. 1999); accord Griggs, 237 F.3d at 381 ("[A]n ERISA fiduciary that knows or should know that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent . . . ."); Krohn, 173 F.3d at 548 ("[T]he 'duty to inform . . . entails . . . an affirmative duty to inform when the trustee knows that silence might be harmful.'" (quoting Bixler v. Cent. Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300 (3rd

-23-

Cir.1993)); <u>Shea</u> v. <u>Esenstein</u>, 107 F.3d 625, 629 (8th Cir. 1997) ("[A]n ERISA fiduciary has a duty to speak out if it 'knows that silence might be harmful'" (quoting <u>Bixler</u>, 12 F.3d at 1300)); <u>Eddy</u>, 919 F.2d at 752 ("Once [the beneficiary] had made clear his situation, [the fiduciary] had a duty to provide the material information.").

Second, fiduciaries need not generally provide individualized unsolicited advice. <u>See</u>, <u>e.g.</u>, <u>Griggs</u>, 237 F.3d at 381 ("ERISA does not impose a general duty requiring ERISA fiduciaries to ascertain on an individual basis whether each beneficiary understands the collateral consequences of his or her particular election."); <u>Bowerman</u>, 226 F.3d at 590-91 ("ERISA does not require 'plan administrators to investigate each participant's circumstances and prepare advisory opinions for literally thousands of employees.'" (quoting <u>Chojnacki</u> v. <u>Ga.-Pac. Corp.</u>, 108 F.3d 810, 817-18 (7th Cir. 1997))); <u>Maxa</u> v. <u>John Alden Life Ins. Co.</u>, 972 F.2d 980, 985-86 (8th Cir. 1992) (finding no fiduciary duty "individually to notify participants and/or beneficiaries of the specific impact of the general terms of the plan upon them"). It is "uncontroversial . . . that a fiduciary does not have to regularly inform beneficiaries every time a plan term affects them." <u>Harte</u>, 214 F.3d at 454.

As to the first limitation, there is insufficient evidence in the record to suggest that any of the Human Resources employees knew or should have known that Watson was likely to need LTD benefits in either 1993 or 1995-96. <u>See</u> <u>Joyce</u> v. <u>RJR Nabisco</u>

Holdings Corp., 126 F.3d 166, 175 (3d Cir. 1997) ("We cannot say that RJR knew, or had good reason to know, that Joyce was likely to be eligible for [LTD] benefits.")  Sussman testified that, although he discussed Watson's poor attendance with Watson's supervisor, he was not aware of Watson's health problems until 1999.  Even if the other Human Resources representatives had information that Watson's health was poor, they had nothing to indicate that his condition was likely to deteriorate to the point of total disability.  After all, Watson worked part-time for almost three years from 1996 on and sought a full-time job roughly two years after he went to part-time work.

As to the second limitation, neither the Human Resources employee who responded to Watson's inquiry about medical benefits, nor the employee who processed his change of employment status paperwork, violated any fiduciary duty by failing to conduct a sua sponte personalized benefits assessment for Watson.  There is no evidence that either Human Resources employee had any reason to think that Watson was unaware of his benefits and the basic eligibility requirements for them.

Watson has a stronger argument that the Human Resource employees should have known he would be interested in partial disability benefits, which provide income replacement for individuals who must reduce their work schedule due to disability. However, there is scant information in the record about Watson's conversations with the Human Resources employees.  Watson has not pointed to sufficient facts to suggest that they had reason to know

of his partial disability or impending full disability.  Further, there is no evidence that in 1995-1996 the defendants knew that Watson had not been given the LTD information in 1993, or that he was unaware of LTD insurance altogether.  The only thing in the record on this point suggests just the opposite.  When he first began employment in October 1992, Watson signed a benefits information sheet that listed the LTD Insurance program, with a notation "N/A."  See, e.g., Joyce, 126 F.3d 166 (no fiduciary breach in failing to inform employee of LTD benefits where employee had received and read benefits manual).

The only case we have found in which an appeals court held that a failure to adequately inform a plan beneficiary about plan requirements constituted a breach of fiduciary duty where the fiduciary had no reason to know that the beneficiary would be harmed by the lack of information is Jordan, 116 F.3d at 1014-17. The Jordan court reversed a grant of summary judgment where the employer had failed to provide the employee with an official Summary Plan Description of his retirement benefits and had failed to inform him that retirement elections were nonrevocable after retirement, despite the facts that the employee never inquired about revocability and the employer had no reason to suspect that revocability would be an issue.  Id.  However, in Jordan, the plaintiff apparently had no way of knowing that the election was nonrevocable; he was provided with information about the plan, which said nothing about the revocability of the election and therefore could be considered misleading. Watson, in contrast, has

not introduced evidence that the information he was given was in any way misleading, either directly or by omission.  See Varity Corp., 516 U.S. at 506; Eddy, 919 F.2d at 749 (fiduciary's technical distinction between policy conversion and policy continuation was misleading to beneficiary).  Further, Watson could have discovered the existence of the plan if he had attended the annual benefit fair, or if he had asked for a full listing of all benefits for which he was eligible.

Watson also alleges that Deaconess was in breach of its fiduciary duty by inducing him to reduce his schedule to part-time so that he would lose his disability benefits.  There is nothing in the record to support such a claim.  The evidence in the record is that his supervisor encouraged him to accept part-time status because of the trouble he had in fulfilling the requirements of his full-time job.  Although there is evidence that the supervisor spoke with the Human Resources director, there was no evidence that they discussed Watson's disability benefits, or even the fact that Watson was ill.

C.  Other Appropriate Equitable Relief Under ERISA

Watson argues that Deaconess may be liable even if it did not act as a fiduciary because the ERISA equitable relief provision, 29 U.S.C. § 1132(a)(3), is not limited to suits for breach of fiduciary duty.  He argues that the hospital violated its duty under 29 U.S.C. §§ 1021 and 1024 to provide him with a summary plan description within ninety days after the employee becomes a plan participant and to notify him of changes in the plan, 29

U.S.C. § 1024(b)(1)(A),[16] and that § 1132(a)(3) entitled him to seek equitable relief for this violation.

Our discussion above disposes of Watson's claim: substantive remedies typically are not available for violations of ERISA's technical notice and disclosure requirements. For garden variety technical violations, beneficiaries are limited to their remedies under § 1132(c). Watson has no remedy under § 1132(a)(3).

D. Complaint Against Caregroup

The district court granted Caregroup's Rule 12(b)(6) motion to dismiss without prejudice to Watson, because Watson had not pled that Caregroup acted in bad faith with regard to the nondisclosure of the policy, and a simple violation of the disclosure requirement did not constitute a fiduciary breach.

Caregroup argues that neither Caregroup, nor its predecessor Pathways, acted as plan administrator prior to January 1, 1996, and that there was no way that either company could have had any duty to Watson prior to 1996. Caregroup further argues that, under 29 U.S.C. § 1024(b)(1), it had ninety days after January 1, 1996, to provide Watson with information about the plan, if he in fact was a plan participant at that time. Watson concedes that he had ceased to be a plan participant before this ninety day

---

[16] Section 1024(b) only requires that the administrator supply summary plan descriptions to "each participant, and each beneficiary receiving benefits under the plan." Therefore, Watson was only entitled to receive a plan description during the period of time that he was actually a plan participant. See Barrs, 287 F.3d at 207. We assume for these purposes that he was a plan participant during the period that he was a full-time employee, from November 5, 1993, until late 1995.

period elapsed, and therefore he can have no claim against Caregroup for any failure to provide him with a summary plan description. Insofar as Watson is claiming that Caregroup violated a fiduciary duty by not otherwise informing him of the LTD policy when he changed his employment status in March 1996, Watson has not alleged sufficient facts to support such a claim. Watson does not allege that he ever contacted Caregroup, that Caregroup ever provided him with any misleading information, or that any other circumstances existed that would suggest a breach of fiduciary duty. The complaint against Caregroup was properly dismissed.

E.   Denial of Motion to Amend Complaint

On May 15, 2001, after the close of discovery, Watson attempted to amend his complaint to add two additional defendants: Fred Sussman, the hospital's Human Resources Director and the plan administrator from November 1994 through 1995; and Pathways, the plan administrator from January 1996 until October 1996. This was Watson's second attempt to amend his complaint to add defendants; in March 2001, the district court had allowed Watson's post discovery motion to add Liberty and Caregroup as defendants. The district court denied Watson's second motion to amend, holding that the "proposed new claims are largely untimely under the relevant statute of limitations, would be subject to dismissal for failure to state a claim, and would result in undue delay and further prejudice to the parties." Watson v. Deaconess Waltham Hosp., No. 00-10583-WGY, slip op. at 3 (D. Mass. June 1, 2001). Watson argues that his delay is due to the fact that he did not receive a copy of

the first Liberty LTD policy (in effect from January 1, 1996, until January 1, 1998) until March 29, 2001, when he received it in response to a subpoena, and therefore was uncertain what policy was in effect during the early months of 1996.

Watson argues that the claims against Pathways and Sussman were within ERISA's statute of limitations. ERISA provides that claims based on a breach of fiduciary duty must be brought within six years of the breach or "the latest date on which the fiduciary could have cured the breach or violation," and within three years of the date on which the plaintiff had actual knowledge of the breach. 29 U.S.C. § 1113. In cases of fraud or concealment, ERISA provides an alternate statute of limitations of six years from the date the plaintiff discovers the breach. Id. Watson argues that the plan administrators could have cured the breach up until March 1996, at which point he went part-time and became ineligible for the plan, and that he did not discover the breach until he learned of the plan's existence in February 1999. He also alleges fraud and concealment.

Absent fraud or concealment, a claim against Sussman would have to have been brought by December 31, 2001 (six years after the date on which Sussman ceased to be a plan administrator). Watson did not attempt to add Sussman until several months after this date had passed. There is no evidence in the record that Sussman took any steps to conceal the existence of the LTD policy. Sussman promptly provided Watson with copies of the Confederation, Northwestern, and Liberty policies when Watson requested them in

-30-

1999.  The Liberty policy Sussman provided was the more recent policy, in effect from 1998 onwards, which had superseded the Liberty policy that took effect in 1996.  But the cover memo from Sussman clearly indicated that the Northwestern policy was in effect only until December 31, 1995.  This is not concealment, and any ERISA claim against Sussman based on fiduciary breach was barred by the statute of limitations.  At any rate, as we have held there was no breach by Deaconess, there was also no breach by Sussman.

As to Pathways, the defendants correctly argue that Pathways Health Network cannot be added as a defendant because it no longer exists.  Watson's claims against Pathways would, in any event, fail for the same reason that his claim against Caregroup, discussed above, must fail.

F.  Claims Against Policy Carrier

The district court entered summary judgment for Liberty Life Assurance, the policy carrier from January 1, 1996 onwards, on all counts, following the same reasoning that it had used to enter judgment on case stated for Deaconess.  We agree that Watson has not presented facts sufficient to suggest that Liberty was in breach of any fiduciary duty to him by failing to inform him of the existence of the Liberty policy in 1996.[17]  It was the plan

_____

[17]  Because we hold that there was no fiduciary breach, we need not reach the question of whether the Liberty plan's requirement that any legal suit be filed within one year from the time he was required to file his proof of claim is an unreasonable modification of the ERISA statute of limitations, or whether such a policy-based limitation would apply to fiduciary breach claims (or only to claims based on the policy itself, such as denial of

-31-

administrator's responsibility to provide Watson with the summary plan description and, as we held above, even a failure to comply with this responsibility does not, under ordinary circumstances, constitute a breach of fiduciary duty. Moreover, Liberty had no interactions with Watson during the crucial time period in which he allowed his LTD eligibility to lapse and failed to apply for partial disability benefits. Therefore, Liberty did not breach any fiduciary duty, either by its acts or its failure to act.

## III.

Conclusion

The judgments entered by the district court are <u>affirmed</u>. No costs are awarded.

---

benefits claims).

Appendix A

| Date | Employment Status | Plan Insurer | Plan Administrator |
|---|---|---|---|
| 10/5/92 (Watson begins work) | Part-time, scheduled at 24 hrs/wk | Confederation | Waltham-Weston Hospital |
| 11/5/93 | Full-time, scheduled at 40 hrs/wk | " | " |
| 11/1/94 | " | Northwestern | HR Director for Waltham-Weston Hospital (Sussman) |
| 2/1/95 (hospital bought by Deaconess) | " | " | HR Director for Deaconess Hospital (Sussman) |
| 11/95 | Full-time, but Watson concedes he was actually working fewer than 36 hrs/wk | " | " |
| 12/19/95 (Watson hospitalized for heart problems) | " | " | " |
| 1/1/96 | " | Liberty | Pathways |
| 3/17/96 | Part-time, scheduled at 32 hrs/wk | " | " |
| 10/1/96 | " | " | Caregroup |
| 1/1/1998 (new policy, also through Liberty) | " | " | " |
| 2/3/99 (Watson first learns of LTD policy) | " | " | " |

| | | | |
|---|---|---|---|
| 3/29/99 | Full-time | " | " |
| 4/28/99 | Disability leave | " | " |