# United States Court of Appeals
## For the First Circuit

Nos. 15-1458
     15-1515

KIMBERLY P. DECAMBRE,

Plaintiff, Appellant, Cross-Appellee,

v.

BROOKLINE HOUSING AUTHORITY; MATTHEW S. BARONAS; JANICE MCNIFF;
CAROLE BROWN,

Defendants, Appellees, Cross-Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Kayatta, Stahl, and Barron,
Circuit Judges.

J. Whitfield Larrabee, with whom Law Offices of J. Whitfield
Larrabee, was on brief, for appellant.
John Egan, with whom Amy M. McCallen and Rubin & Rudman, LLP,
were on brief, for appellees.
Emily S. Starr, Starr, Vander, Linden, LLP, Ron M. Landsman,
and Ron M. Landsman, P.A., on brief for the National Academy of
Elder Law Attorneys, Inc., Special Needs Alliance, Inc., and
National Housing Law Project, amici curiae in support of appellant.

June 14, 2016

**KAYATTA**, **Circuit Judge**.    Upon learning that disabled tenant Kimberly DeCambre ("DeCambre") was receiving distributions from an irrevocable trust account funded with the proceeds from a series of legal settlements, the Brookline Housing Authority ("the BHA") determined that DeCambre was "over-income" for continued participation in a federal housing assistance program that the BHA administered at the local level.    The BHA reaffirmed this determination over DeCambre's internal appeal and did not grant DeCambre's requests that it exclude all, or at least some of, these trust disbursements from its income calculation in reasonable accommodation of her disability.    DeCambre then brought suit against the BHA and three of its employees, alleging that the BHA had violated state and federal law by miscalculating her income under the pertinent federal regulations and by engaging in disability-based discrimination.    See DeCambre v. Brookline Hous. Auth., 95 F. Supp. 3d 35, 36–37 (D. Mass. 2015).    The district court voiced reservations about the BHA's income calculation, id. at 49–51, and suggested that the BHA on "remand," id. at 51, could provide "more thorough and thoughtful analysis," id. at 52, but nevertheless ruled for the defendants on all counts.    DeCambre appealed, and the defendants cross-appealed the remand order.    Because we hold that the BHA incorrectly construed federal regulations in calculating DeCambre's income, we reverse the

- 3 -

district court's judgment in part, thereby mooting the cross-appeal.

## I.  Background

Section 8 of the United States Housing Act of 1937 ("Housing Act"), added as part of a 1974 amendment, authorizes the Department of Housing and Urban Development ("HUD") to devote federal funds to housing assistance for "the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing."  Housing and Community Development Act of 1974, tit. 2, sec. 201, § 8(a), Pub. L. No. 93-383, 88 Stat. 633, 662 (codified as amended at 42 U.S.C. § 1437f(a)).  Under the Section 8 Federal Housing Choice Voucher Program ("the Program"), HUD provides housing assistance funding to state and local public housing authorities, which in turn administer the Program at the local level by making rent subsidy payments to landlords on behalf of participating tenants.  See 24 C.F.R. § 982.1(a)(1)-(2).  The amount of a tenant's monthly subsidy depends on her income.  Specifically, the Housing Act provides that a participating tenant's subsidy is generally equal to her total monthly rent obligation minus "30 percent of the monthly adjusted income of the [tenant's] family."  42 U.S.C. § 1437f(o)(2)(A)(i).

DeCambre has participated in the Program, as locally administered by the BHA, since 2005.[1]  As part of her obligation to annually recertify her eligibility for the Program, DeCambre was required each year to submit an Application for Continued Occupancy, which asked her to list, among other things, her assets and her sources of income.  In September 2013, DeCambre submitted an application for the year beginning December 1, 2013.  DeCambre's application listed among her assets a trust that had been established by a Massachusetts court order in June 2010 to hold DeCambre's proceeds from a series of tort settlements.  The trust had been established as an irrevocable disability-based Supplemental Needs Trust ("SNT")--a type of trust that holds funds on behalf of a disabled person, such as DeCambre, and that allows the beneficiary's eligibility for certain Social Security and state health benefits to remain unaffected by the funds held in trust.  See 42 U.S.C. § 1396p(d)(4)(A); 130 C.M.R. § 520.008(H).  As an SNT, DeCambre's trust assigned a trustee "sole discretion to determine how the property of the trust [would] be spent for the needs of [DeCambre]," who was not herself permitted "voluntarily or involuntarily [to] alienate the income or principal of the trust."

---

[1] The parties agreed to dispose of this case on a stipulated factual record, so we draw our statement of the facts from the parties' stipulations.  See Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 4 (1st Cir. 2012).

Upon receiving the September 2013 application that listed DeCambre's SNT among her assets, the BHA calculated based on DeCambre's reported income that, effective December 1, 2013, DeCambre's obligation toward her monthly rent of $1,560 would be $435, with the BHA subsidizing the remainder. At the same time, the BHA notified DeCambre that it also intended to count disbursements from her SNT toward her income and so requested that she provide the SNT's account statements from the past three years. DeCambre provided the requested information, and in mid-December 2013 the BHA issued a Notice of Rent Adjustment, informing DeCambre that because the BHA was now counting $62,828.99 in trust disbursements toward DeCambre's 2013 income,[2] DeCambre was "over-income" for the Program and, effective February 1, 2014, would be responsible for paying the entirety of her monthly rent without any subsidy.

Soon thereafter, DeCambre notified the BHA that she was appealing its rent adjustment on the grounds that her SNT distributions should have been categorically excluded from income under HUD regulations or, alternatively, on the grounds that certain specific distributions should have been excluded under the regulations as payments offsetting "the cost of medical expenses,"

---

[2] Actual SNT disbursements during the relevant period totaled $71,728.98, but the BHA excluded $8,899.99 of these disbursements as exempt from income because they had been used to pay for trustee fees, dental work, and a medically necessary air conditioner.

24 C.F.R. § 5.609(c)(4), or as "[t]emporary, nonrecurring or sporadic income," id. § 5.609(c)(9). While the internal appeal was pending, DeCambre also submitted a Request for Reasonable Accommodation citing state and federal disability discrimination law, asking that SNT distributions used to pay for automobiles, cellular and landline phone services, and veterinary care for her cats be excluded from her income on medical necessity grounds. Following a May 27, 2014, hearing, a BHA hearing officer issued a written opinion upholding the BHA's calculation of DeCambre's income and expressing the view that "the BHA correctly denied Ms. DeCambre's reasonable accommodation request."[3]

On July 8, 2014, DeCambre sought reconsideration of the hearing officer's decision regarding the BHA's income calculation and also supplemented her previous Request for Reasonable Accommodation, this time requesting that all SNT distributions be excluded from income on the grounds that she needed to maintain her assets in an SNT in order to remain eligible for disability-based Social Security and state health care benefits. The next day, DeCambre filed suit against the BHA and three BHA employees in Massachusetts state court. The operative complaint alleged violation of DeCambre's civil rights under the Housing Act and the Fourteenth Amendment, with relief sought under 42 U.S.C. § 1983

---

[3] The hearing officer also found that the BHA acted in good faith in scheduling a timely hearing.

("Section 1983"); violation of state and federal antidiscrimination law; breach of lease and interference with DeCambre's quiet use and enjoyment of her residence in violation of state law; and entitlement to declaratory, injunctive, and mandamus relief under a smattering of legal and equitable remedial theories.[4]

After the defendants timely removed the suit to federal court,[5] DeCambre moved for a preliminary injunction enjoining the BHA from including her SNT disbursements in her annual income and requiring the BHA to reinstate her subsidy payments retroactively. At a hearing on this motion, the parties agreed to collapse the preliminary injunction and merits determinations into a single proceeding and to allow the district court to resolve the case as a "case stated"--a posture in which a district court is entitled to decide a case on the merits on the basis of a factual record to

---

[4] The complaint also included a count titled "Preemption and Federal Supremacy." It is unclear whether DeCambre intended this count to assert an additional cause of action and, if so, what its legal moorings would be. At any rate, the district court made no mention of this claim, and DeCambre does not press it on appeal. It is therefore abandoned. See Kearney v. Town of Wareham, 316 F.3d 18, 22 (1st Cir. 2002).

[5] The notice of removal (and the parties' statement of stipulated facts) misstates the date on which DeCambre filed suit in state court as August 8, 2014. DeCambre had actually filed suit in state court nearly a month prior, on July 9, 2014. Even so, because it is uncontested that the defendants were first served with the complaint no earlier than August 11, 2014, defendants' removal to federal court on August 21, 2014, was timely in any event. See 28 U.S.C. § 1446(b)(1).

which the parties have stipulated, along with any factual inferences the court draws from that record. See TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007). After hearing the parties' arguments, the district court issued an opinion denying DeCambre's Fourteenth Amendment and discrimination claims, DeCambre, 95 F. Supp. 3d at 46-49, "affirm[ing] the decision of the BHA in [its] income and rent calculations," id. at 52, and denying DeCambre's motion for a preliminary injunction, id. at 51-52.[6]

At the same time, the district court pointed to SNT distributions that DeCambre had used to pay for cable, internet, travel, and telephone service as "non-extravagant" expenditures that could have been excluded from income, id. at 50-51; observed that the BHA should have "determine[d] whether DeCambre's cats could be categorized as emotional support animals," such that SNT distributions used to pay for their veterinary care could have been excluded from income as medical expenses, id. at 51; and found that "the fact that title" to an automobile purchased with SNT funds was "held by [DeCambre's] trust as an asset should preclude [the SNT distribution used to purchase the car] from being counted

---

[6] The district court also found that DeCambre "did not adequately prove each element" of her state-law breach of lease and interference with quiet use and enjoyment claims and so ruled against her on those claims as well. DeCambre, 95 F. Supp. 3d at 41. DeCambre does not challenge these rulings on appeal.

towards income," id.  In the wake of these observations, the district court remanded DeCambre's case back to the BHA, seemingly for "a more thorough determination of each potentially excludable expense proffered by DeCambre," id., despite having "affirm[ed] the decision of the BHA in [its] income and rent calculations," id. at 52.  DeCambre timely appealed the judgment against her, and the defendants cross-appealed the district court's remand order.

With this background in place, we proceed to our analysis, starting as we must with the threshold question of whether this court has the authority to hear these appeals.

## II.  Jurisdiction

Although neither party contests this court's jurisdiction, "an appellate court has an unflagging obligation to inquire sua sponte into its own jurisdiction," including its appellate jurisdiction.  Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Colombani, 712 F.3d 6, 10 (1st Cir. 2013) (quoting Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151, 156 (1st Cir. 2004)).

The March 26, 2015, order that the parties have appealed reads, in full:

> In accordance with the Court's Memorandum and Order dated March 25, 2015, the motion for preliminary injunction is therefore DENIED, and DeCambre's appeal of her Section 8 eligibility is REMANDED to the [BHA].

- 10 -

While this court has appellate jurisdiction over a denial of a preliminary injunction, see 28 U.S.C. § 1292(a)(1), our ability to assume appellate jurisdiction over a case's merits is typically triggered only by a "final decision[]," id. § 1291.  In keeping with our understanding that a final decision is one that "ends the matter in dispute, leaving nothing to be done but the execution of the judgment," Foxworth v. Maloney, 515 F.3d 1, 3 (1st Cir. 2008), "a district court order that remands to an administrative agency for further proceedings is not [necessarily] considered a 'final decision.'"  Global Naps, Inc. v. Mass. Dep't of Telecomms. & Energy, 427 F.3d 34, 41 (1st Cir. 2005).

Here, however, it is not clear from the district court's opinion exactly what further proceedings the district court anticipated following remand to the BHA.  While the opinion appears to find possible error in the BHA's income calculation, see DeCambre, 95 F. Supp. 3d at 49-51, and suggests that the BHA may be required to "perform a more thorough determination of each potentially excludable expense proffered by DeCambre," id. at 51, it at the same time purports to affirm the BHA's income calculation, see id. at 52, and explicitly "upholds the BHA's determination in terminating DeCambre's Section 8 eligibility," id. at 51.

- 11 -

Compounding this uncertainty, nearly three months into the pendency of this appeal, the district court purported to reopen the case and enter a retroactive order that reads, in full:

> Judgment for the Defendants on all claims asserted against them in the Plaintiff's First Amended Complaint, and the appeal of the Plaintiff's Section 8 eligibility is remanded to the [BHA].

The district court established no basis for its attempt to reassert jurisdiction over a case already embroiled in appellate proceedings, and so the order does not in itself hold legal force.[7] See Griggs v. Provident Consumer Disc. Co., 459 U.S. 56, 58 (1982) (per curiam) ("The filing of a notice of appeal is an event of jurisdictional significance--it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."). However, in light of the ambiguity as to the intention behind the original March 26 order, this court understood the district court's later-in-time

---

[7] Several courts have held that a district court retains jurisdiction to certify a matter for appeal under Federal Rule of Civil Procedure 54(b) notwithstanding the fact that the appeal has already been docketed. See, e.g., Crowley Mar. Corp. v. Pan. Canal Comm'n, 849 F.2d 951, 953-54 & n.1 (5th Cir. 1988). But even were we to adopt this rule in our circuit--an issue we do not decide today--the district court's order, although entered in response to DeCambre's motion for entry of judgment under Rule 54(b), does not fall within the rule's scope. Rule 54(b) permits a district court, under certain circumstances, to "direct entry of a final judgment as to one or more, but fewer than all, claims." Fed. R. Civ. P. 54(b). Here, however, the order purported to establish judgment for all defendants on all claims.

order as an indication of its wish to provide clarification.  Cf. United States v. Maldonado-Rios, 790 F.3d 62, 65 (1st Cir. 2015) (per curiam) (district court order entered after appellate court had already assumed jurisdiction could be treated as a purely indicative ruling).  Accordingly, we remanded to permit the district court to do so.  See 1st Cir. R. 12.1(b).

On remand, the district court entered an order clarifying that the March 26 order that forms the subject of this appeal was intended to enter judgment for the defendants on all counts, despite referring only to DeCambre's motion for a preliminary injunction, and that the order's provision for a remand to the BHA "was simply to indicate that the [BHA] had primary jurisdiction over this matter."  In other words, the March 26 order denied DeCambre all the relief she sought and required no further proceedings in the BHA.[8]  It is therefore a final decision that, if left to stand, would "end[] the matter in dispute," Foxworth, 515 F.3d at 3, and that therefore triggers this court's appellate jurisdiction over the dispute's merits.

---

[8] Despite this clarification, the defendants have not asked us to dismiss their cross-appeal of the remand order that effectively demands nothing of them.  But because we ultimately hold the cross-appeal to be moot on other grounds, we need not decide whether the district court's clarification of the remand order itself moots the cross-appeal, which was predicated on the understandable impression that the remand order required the BHA to "'reconsider[]' . . . DeCambre's appeal of her Section 8 eligibility."

With our jurisdiction thus established, we turn now to the merits. Because the parties agreed to allow the district court to adjudicate the merits on a case stated basis, we review the district court's legal conclusions de novo and its factual findings and inferences for clear error. See Watson v. Deaconess Waltham Hosp., 298 F.3d 102, 108 (1st Cir. 2002).

### III. The BHA's Calculation of DeCambre's Income

DeCambre's primary claim on appeal is that the BHA calculated her income incorrectly under the relevant HUD regulations and that the resultant overstatement of her income diminished the amount of her monthly Section 8 subsidy--in this case, to zero.[9] DeCambre contends that this alleged miscalculation violates not only the Housing Act, pursuant to which the regulations at issue were promulgated, but also the Fourteenth Amendment. We address these contentions in reverse order.

---

[9] Although DeCambre has also sued three named BHA employees, the district court observed that DeCambre has neglected to indicate whether she is suing these employees in their individual or official capacities. DeCambre, 95 F. Supp. 3d at 47. DeCambre has not corrected this oversight on appeal. Nor does DeCambre challenge the district court's determination that the employees are shielded from an individual-capacity suit by the doctrine of qualified immunity, which leaves state agents personally liable for violation of only those statutory or constitutional rights that have been "clearly established." Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). We therefore understand DeCambre to have intended an official-capacity suit, which we treat as "the functional equivalent of a suit against the sovereign." Danny B. ex rel. Elliott v. Raimondo, 784 F.3d 825, 834 (1st Cir. 2015). Our opinion will accordingly treat all of DeCambre's claims as leveled exclusively against the state agency.

## A.   DeCambre's Fourteenth Amendment Claims

DeCambre claimed below that the BHA's allegedly erroneous income calculation deprived her of substantive and procedural due process under the Fourteenth Amendment, and she sought relief under Section 1983.  See Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 639 (1st Cir. 2013) (Section 1983 provides cause of action for constitutional due process claims).  The district court rejected these constitutional claims on the merits, and DeCambre's opening brief on appeal does not attempt to revive them, grounding DeCambre's claim to Section 1983 relief solely on the BHA's alleged violation of rights conferred by the Housing Act rather than the Constitution.  DeCambre has therefore abandoned her Fourteenth Amendment claims.  See Juárez v. Select Portfolio Servicing, Inc., 708 F.3d 269, 273 n.3 (1st Cir. 2013).

## B.   DeCambre's Housing Act Claims

Under the Housing Act, a Section 8 participant is typically responsible for paying "30 percent of the monthly adjusted income of [her] family" toward rent, after which the public housing authority subsidizes any remaining rent obligation. 42 U.S.C. § 1437f(o)(2)(A)(i).  A tenant's "adjusted income," per HUD regulations, equals her "annual income," less certain

- 15 -

specified deductions.[10]  24 C.F.R. § 5.611.  The regulations define "annual income," in turn, as, in relevant part, "all amounts, monetary or not, which . . . [g]o to, or on behalf of" the tenant or her family, or which "[a]re anticipated to be received from a source outside the family" during the relevant year, and which are not "specifically excluded."  Id. § 5.609(a).  Among the amounts specifically excluded from annual income are "[l]ump-sum additions to family assets, such as . . . settlement for personal or property losses," id. § 5.609(c)(3), "[a]mounts received . . . that are specifically for, or in reimbursement of, the cost of medical expenses," id. § 5.609(c)(4), and "[t]emporary, nonrecurring or sporadic income," id. § 5.609(c)(9).

DeCambre argues that because the funds in her SNT derive from a series of lump-sum settlement payouts, the BHA was required to exclude all of her SNT disbursements from her annual income. In the alternative, DeCambre argues that several specific disbursements that were counted toward her annual income should have been excluded because they fell into either the "medical expenses" exclusion or the "[t]emporary, nonrecurring or sporadic income" exclusion.  Before we turn to the merits of these claims, however, we must first determine whether alleged Housing Act

---

[10] Intuitively, "monthly adjusted income" is calculated by dividing a tenant's "adjusted income" by twelve.  24 C.F.R. § 5.603(b).

violations of this type give rise to a cause of action under state or federal law.

## 1. DeCambre's Cause of Action

"Statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress . . . to determine . . . who may enforce them and in what manner." <u>Davis</u> v. <u>Passman</u>, 442 U.S. 228, 241 (1979). DeCambre does not contend that the Housing Act itself expressly authorizes individual plaintiffs to seek legal redress for violations. Rather, she argues primarily that the Housing Act creates rights that may be enforced under Section 1983, which enables a private plaintiff to bring suit against, inter alia, state agencies for "the deprivation of any rights . . . secured by the Constitution and laws."[11] 42 U.S.C. § 1983.

---

[11] At oral argument, and in her complaint, DeCambre also asserted that the Massachusetts judicial review and certiorari statutes afforded her a cause of action. <u>See</u> Mass. Gen. Laws ch. 30A, § 14 (judicial review); <u>id.</u> ch. 249, § 4 (certiorari). Massachusetts courts have suggested that the actions of public housing authorities are subject to judicial review under one or the other of these statutes. <u>See</u> <u>Rivas</u> v. <u>Chelsea Hous. Auth.</u>, 982 N.E.2d 1147, 1151–52 (Mass. 2013) (following lower court in reviewing tenant's termination from state voucher program under judicial review statute); <u>Costa</u> v. <u>Fall River Hous. Auth.</u>, 881 N.E.2d 800, 802 (Mass. App. Ct. 2008) (reviewing termination of tenant's Section 8 subsidy under certiorari statute). Because we find that DeCambre has a cause of action under Section 1983, because she seeks no relief under state law that is unavailable under Section 1983, and because she has not adequately developed (and has therefore waived) any state-law argument, <u>see</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990), we find it unnecessary to resolve the unbriefed question of whether

- 17 -

Many federal statutory rights are enforceable under Section 1983. See Maine v. Thiboutot, 448 U.S. 1, 4–8 (1980). In determining whether any given statutory provision creates an enforceable right, we ask whether the provision "unambiguously confer[s] [a] right to support a cause of action." Colón-Marrero v. Vélez, 813 F.3d 1, 17 (1st Cir. 2016) (second alteration in original) (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002)). Specifically, we determine (1) whether the provision clearly creates a right that redounds to the benefit of the plaintiff; (2) whether the right the provision supposedly confers is not too "vague and amorphous" to be enforceable; and (3) whether the provision creates a binding obligation on the state. Id. (quoting Blessing v. Freestone, 520 U.S. 329, 340 (1997)). If we answer these questions in the affirmative, the provision is presumptively enforceable under Section 1983, and it becomes the defendant's responsibility to demonstrate that Congress nonetheless intended to bar Section 1983 relief for violation of the right at issue. See id. at 20.

The BHA's brief unhelpfully conflates the question of whether DeCambre has a cause of action under Section 1983 with its

---

Massachusetts law creates a cause of action for the specific violation alleged here--namely, miscalculation of a Section 8 tenant's annual income.

attack on the merits of DeCambre's constitutional claims.[12] Nowhere has the BHA attempted to engage our three-pronged framework for determining whether a federal statute creates a right that may be enforced under Section 1983. While the BHA does seem to rely on the district court's determination that no "statutory or judicial authority mandat[es] that SNT distributions are excluded from income calculations," DeCambre, 95 F. Supp. 3d at 48, such a determination goes to the merits question of whether the BHA's income calculation violated DeCambre's rights; it does not speak to the threshold question of whether the Housing Act gives DeCambre an enforceable right not to be required to put more than 30% of her monthly adjusted income, however calculated, toward her rent.

Thankfully, the Supreme Court has provided guidance in the context of a similar Housing Act provision in Wright v. City of Roanoke Redevelopment & Housing Authority, 479 U.S. 418 (1987). In Wright, the Court considered a provision of the 1969 Brooke Amendment, Pub. L. No. 91-152, tit. 2, sec. 213, 83 Stat. 389,

--------

[12] In arguing that DeCambre has no cause of action under Section 1983, the BHA primarily echoes the district court's determination that DeCambre has provided no persuasive argument "as to whether [she] has a constitutionally protected property right to the regulatory rent ceiling." DeCambre, 95 F. Supp. 3d at 48. Such an argument, however, says nothing about whether or not DeCambre has a cognizable statutory right to pay no more than 30% of her income in rent. Indeed, the district court must have implicitly found that DeCambre had some cause of action; otherwise, there would have been no reason for the court to have addressed the merits of her contention that the BHA improperly calculated her annual income.

- 19 -

which, as amended, provided that "[a] family" living in a public housing project "shall pay as rent" a specified percentage of its income, Wright, 479 U.S. at 420 n.2 (quoting 42 U.S.C. § 1437a(a) (1982)).  Although the Brooke Amendment itself said nothing about utilities charges, HUD regulations made clear that "rent" under the Brooke Amendment's rent ceiling provision included not only a tenant's contract rent, but also "a reasonable amount for the use of utilities."  Id. at 420.  Three tenants brought suit against their public housing authority, alleging that the agency had violated this regulatory guarantee by imposing a utilities surcharge that, when combined with their contract rent, brought their monthly payments above the statutorily permissible percentage.  Id. at 421–22.

The Court held that the tenants had asserted a cognizable cause of action under Section 1983, id. at 419, finding "little substance" in the claim that the Brooke Amendment and HUD regulations provided "no enforceable rights within the meaning of [Section] 1983," id. at 430.

> The Brooke Amendment could not be clearer:  as further amended in 1981, tenants could be charged as rent no more and no less than 30 percent of their income.  This was a mandatory limitation focusing on the individual family and its income.  The intent to benefit tenants is undeniable.

Id.  Nor was it relevant that the tenants relied on an interpretation of the right that appeared in HUD regulations rather

than in the statutory text, given the interpretive deference owed to HUD as the agency responsible for implementing the Brooke Amendment. Id. Finally, the Court rejected the contention that "the provision for a 'reasonable' allowance for utilities is too vague and amorphous to confer on tenants" a right that is enforceable under Section 1983. Id. at 431.

The BHA offers no reason that Wright's interpretation of the Brooke Amendment's rent ceiling does not apply foursquare to Section 8's rent ceiling, which provides:

> [T]he monthly assistance payment for a family receiving assistance under [the voucher program] shall be determined as follows: . . .
>
> For a family receiving tenant-based assistance, if the rent for the family (including the amount allowed for tenant-paid utilities) does not exceed the applicable payment standard established [in a separate provision], the monthly assistance payment for the family shall be equal to the amount by which the rent (including the amount allowed for tenant-paid utilities) exceeds the greatest of the following amounts, rounded to the nearest dollar:
>
> > (i) 30 percent of the monthly adjusted income of the family.
> >
> > (ii) 10 percent of the monthly income of the family.
> >
> > (iii) If the family is receiving payments for welfare assistance from a public agency and a part of those payments, adjusted in accordance with the actual

- 21 -

> housing costs of the family,
> is specifically designated
> by that agency to meet the
> housing costs of the family,
> the portion of those
> payments that is so
> designated.

42 U.S.C. § 1437f(o)(2)(A). As in Wright, the statutory language "unambiguously confer[s] 'a mandatory [benefit] focusing on the individual family and its income.'" Gonzaga, 536 U.S. at 280 (second alteration in original) (quoting Wright, 479 U.S. at 430).[13] As in Wright, HUD regulations flesh out the contours of the statutory right, rendering that right "sufficiently specific and definite to qualify as enforceable." Wright, 479 U.S. at 432. And as in Wright, the Section 8 rent ceiling's specification that a tenant's monthly subsidy "shall be equal" to rent minus a percentage of income, 42 U.S.C. § 1437f(o)(2)(A) (emphasis supplied), creates a "mandatory limitation," Wright, 479 U.S. at 430, that is not cast in precatory terms.[14]

---

[13] Although Wright preceded the Court's admonition in Gonzaga University v. Doe, 536 U.S. 273 (2002), that "it is rights, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of [Section 1983]," id. at 283, the Gonzaga Court did not overrule Wright, see id. at 289-90, which in any event did find that the Brooke Amendment established "enforceable rights," Wright, 479 U.S. at 432 (emphasis supplied).

[14] Although DeCambre here focuses on the calculation of her annual income rather than the calculation of her rent, the two are flip sides of the same coin. Section 8 defines the amount of a tenant's rent subsidy entitlement in direct relation to the tenant's income. See 42 U.S.C. § 1437f(o)(2)(A). It follows that any overstatement of a tenant's income necessarily results in an understatement of her subsidy.

- 22 -

The Fifth Circuit has held that Wright's analysis applies with full force to the Section 8 rent ceiling provision. See Johnson v. Hous. Auth. of Jefferson Par., 442 F.3d 356, 360–62 (5th Cir. 2006) (finding that Section 8 voucher recipients can bring a Section 1983 challenge to a public housing authority's calculation of their utilities allowance because an inadequate allowance would violate their right not to "pay more out of pocket than 30 percent of their incomes for housing," id. at 362); cf. Daniels v. Hous. Auth. of Prince George's Cty., 940 F. Supp. 2d 248, 259 (D. Md. 2013) (tenant could bring a Section 1983 suit to enforce her "federal right to a properly calculated housing subsidy" under an analogously worded Housing Act provision). And although courts have found that certain other Housing Act provisions do not create rights that may be enforced under Section 1983, these provisions are materially distinguishable from the rent ceiling provisions of the Brooke Amendment and Section 8. See, e.g., Johnson v. City of Detroit, 446 F.3d 614, 627 (6th Cir. 2006) (Housing Act's housing quality standards provision not enforceable under Section 1983 because of its "focus on the entity being regulated" and not on the tenant (quoting Johnson v. City of Detroit, 319 F. Supp. 2d 756, 764 (E.D. Mich. 2004))); Banks v. Dall. Hous. Auth., 271 F.3d 605, 610 (5th Cir. 2001) (right to "decent, safe, and sanitary" housing under 42 U.S.C. § 1437f(e) not enforceable under Section 1983, in part because the statutory

- 23 -

provision lacked "[t]he specificity of [the Brooke Amendment's rent ceiling provision], coupled with its focus on the tenants"); cf. also Caswell v. City of Detroit Hous. Comm'n, 418 F.3d 615, 620 (6th Cir. 2005) (regulatory right to continued subsidies during eviction proceedings not enforceable under Section 1983 where, unlike in Wright, the regulation interpreted a statutory provision that did not itself, "in clear and unambiguous terms, confer[] a particular right upon the tenant").[15]  In light of the close textual similarity between the Brooke Amendment's rent ceiling and the rent ceiling at issue here, the Supreme Court's continued approval of Wright, see Gonzaga, 536 U.S. at 289-90, and the weight of persuasive authority from a sister circuit, we hold that Section 8's rent ceiling provision confers a right that is presumptively enforceable under Section 1983.

---

[15] See also McField ex rel. Ray v. Phila. Hous. Auth., 992 F. Supp. 2d 481, 487 (E.D. Pa. 2014) (Housing Act provision requiring public housing authorities to conduct inspections of certain units did not create a right enforceable under Section 1983 because of the provision's focus on the regulator and not the tenants); Koroma v. Richmond Redevelopment & Hous. Auth., No. 3:09cv736, 2010 WL 1704745, at *5-6 (E.D. Va. Apr. 27, 2010) (Housing Act provision providing that a tenant currently receiving Section 8 assistance "may" continue to receive such assistance upon moving to another participating housing unit did not create a right enforceable under Section 1983); Anderson v. Jackson, No. 06-3298, 2007 WL 458232, at *6 (E.D. La. Feb. 6, 2007) (provision that "[u]nlike [the Brooke Amendment and the Section 8 rent ceiling provision], . . . does not focus on the rights of individual residents and families" did not create a right enforceable under Section 1983).

The presumptive availability of Section 1983 relief can, however, be rebutted through a showing of "[c]ongressional intent to 'shut the door to private enforcement'" of the rent ceiling. Colón-Marrero, 813 F.3d at 20 (quoting Gonzaga, 536 U.S. at 284 n.4). Such an intent could be manifest either in "language in the [Housing Act] itself specifically foreclosing a remedy under [Section 1983] or by implication from Congress's creation of 'a comprehensive enforcement scheme that is incompatible with individual enforcement.'" Id. (quoting Gonzaga, 536 U.S. at 284 n.4). That said, we are not to "lightly conclude" that Congress intended to bar private enforcement of a federal right that is presumptively enforceable under Section 1983. Wright, 479 U.S. at 423-24 (quoting Smith v. Robinson, 468 U.S. 992, 1012 (1984)).

We need not rule on this question today; it suffices merely to observe that the BHA has manifestly failed to develop any argument that Congress expressly or impliedly sought to preclude private enforcement of Section 8's rent ceiling provision. See Colón-Marrero, 813 F.3d at 20 ("Appellant makes no meaningful attempt to rebut [the presumption of private enforceability], and we could thus end our analysis here."). The BHA points to no textual indications of such a bar. Nor does the BHA demonstrate any alternative avenue through which tenants can vindicate their rights under Section 8's rent ceiling provision. Cf. Wright, 479 U.S. at 428 (beyond HUD's "generalized powers" to

conduct audits, enforce certain contracts, and cut off federal funds, "[t]here are no other mechanisms provided to enable HUD to effectively oversee the performance of the some 3,000 local [public housing authorities] across the country").  We therefore hold that the BHA has waived any challenge to the presumptive availability of a Section 1983 cause of action for violations of the Section 8 rent ceiling provision, without entirely foreclosing the possibility that a future litigant may be able to successfully raise such a challenge.

We are cognizant that the availability of a federal lawsuit as a means of challenging the income calculations made by public housing authorities may appear to risk overcrowding the federal docket.  Four considerations, however, at least partially ameliorate such concerns.  First, the benefits decisions of public housing authorities are in many places already subject to judicial review under state law.  See, e.g., Mathis v. D.C. Hous. Auth., 124 A.3d 1089, 1099 (D.C. 2015); Walker v. Dep't of Hous. & Cmty. Dev., 29 A.3d 293, 309 (Md. 2011); Rivas v. Chelsea Hous. Auth., 982 N.E.2d 1147, 1151-52 (Mass. 2013); Banks v. Hous. Auth. of Omaha, 795 N.W.2d 632, 633 (Neb. 2011).  Recognition of a federal cause of action, then, may affect the distribution but not necessarily the volume of litigation.  Second, courts will likely apply a healthy measure of deference to the more fact-bound determinations of public housing authorities, see infra notes 20-

21, and so the long odds of success on any challenge to this discretion will counsel against the time and expense of litigation in most instances. Third, the instant case provides an apt illustration of a countervailing concern--the need for national uniformity in resolving certain fundamental interpretive questions regarding the parameters of a federal benefit. Where, as here, a voucher recipient's annual income could vary by over $62,000 depending on one's interpretation of federal law, the drawbacks of allowing judicial interpretation to reside exclusively at the state or local level are self-evident. Fourth, Wright was decided nearly three decades ago, and Johnson extended Wright to the Section 8 context in the Fifth Circuit over ten years ago. Meanwhile, no circuit court has yet declined to apply Wright to Section 8's rent ceiling provision. The gates to federal court, in other words, have long been open, and no flood has yet arrived.

With this threshold matter resolved, we turn now to the legal question at the heart of DeCambre's case--whether the BHA in fact violated DeCambre's rights under federal law by miscalculating her monthly assistance payment.

**2. Inclusion of Settlement-Funded Irrevocable Trust Distributions in Income**

We deal first--and, as it happens, exclusively--with DeCambre's contention that the BHA misapplied HUD regulations by including the disbursements from her SNT in her annual income.

- 27 -

DeCambre's SNT was funded exclusively with the proceeds from a series of tort settlements. Had those settlement proceeds been paid directly to DeCambre, the parties agree that they would have been treated as a "[l]ump-sum addition[] to family assets," and therefore would have been categorically excluded from annual income upon receipt under HUD's regulations. 24 C.F.R. § 5.609(c)(3). Instead, DeCambre agreed to have the settlement proceeds paid into an irrevocable, disability-based SNT, out of which some of those same funds were later disbursed for her benefit at the discretion of the trustee.

HUD addresses irrevocable trusts in the portion of 24 C.F.R. § 5.603(b) ("section 5.603(b)") that defines the term "net family assets." The relevant passage states as follows:

> In cases where a trust fund has been established and the trust is not revocable by, or under the control of, any member of the family or household, the value of the trust fund will not be considered an asset so long as the fund continues to be held in trust. Any income distributed from the trust fund shall be counted when determining annual income . . . .

Id. § 5.603(b). Because funds held in an irrevocable trust are not considered assets under section 5.603(b) so long as they are held in trust, they escape HUD's default rule that effectively requires any income generated by a tenant's assets to be counted toward her annual income upon accrual. See id. § 5.609(a)(4),

- 28 -

(b)(3).[16]   Once an irrevocable trust's accrued income is distributed, however, it "shall be counted when determining annual income."  Id. § 5.603(b).  In short, a plain aim and effect of section 5.603(b) is to postpone the recognition of income derived from holdings in an irrevocable trust until the income is distributed out of the trust.  On all of this, the parties appear to agree.

The dispute concerns, instead, what happens when the trust distributes to or for the benefit of the tenant some or all of the principal originally paid into the trust.  DeCambre's trust generated no substantial earnings or other income; hence, essentially all disbursements were disbursements of principal. DeCambre maintains that this disbursed principal retained the character and classification that it would have had (as a lump-sum addition to family assets, not counted toward annual income) had it been paid directly to her, rather than having first been routed through the irrevocable trust.  The BHA concedes that the regulations themselves do not "squarely" address DeCambre's argument, but it contends that there are at least three reasons to reject DeCambre's ultimate position that the disbursements of her

---

[16] When a tenant's assets exceed $5,000, a minimum income generation is assumed based on a percentage rate determined by HUD.  24 C.F.R. § 5.609(b)(3).

irrevocable trust principal should not have counted toward her annual income.

First, and only briefly in a footnote, the BHA argues that section 5.603(b)'s statement that "[a]ny income distributed from [an irrevocable] trust fund shall be counted when determining annual income," 24 C.F.R. § 5.603(b), means that "any disbursement from [an SNT] is counted toward annual income." But the BHA itself rejected such a broad, categorical reading of section 5.603(b) by excluding from DeCambre's annual income certain SNT disbursements that reimbursed medical expenses. Moreover, an advisory letter that the BHA treats as controlling, authored by one of HUD's regional offices, expressly states that "[n]ot all distributions from a[n] SNT should be counted towards [a Section 8] applicant's annual income." U.S. Dep't of Hous. & Urban Dev., New England PIH Advisory Letter #07-05 (Apr. 18, 2007) (hereinafter, "Advisory Letter"). Rather, the letter provides that only those disbursements "that do not fall under an exclusion or deduction are . . . counted towards annual income." Id. If read to cover only income earned on the trust's principal, however, section 5.603(b)'s reference to "income distributed from the trust fund," 24 C.F.R. § 5.603(b), serves a straightforward function: it ensures that the irrevocable trust income that would otherwise count immediately upon accrual toward annual income as an "amount[] derived . . . from [a tenant's] assets," id. § 5.609(a)(4), but

that does not do so because of section 5.603(b)'s stipulation that an irrevocable trust fund "will not be considered an asset so long as the fund continues to be held in trust," id. § 5.603(b), does eventually count toward annual income when it is disbursed.[17] Were the reference, instead, intended to define irrevocable trust disbursements as a distinct category that must in all cases count toward annual income, one would have expected HUD to place the reference under the definition of "annual income" and not as a caveat appended to a provision ostensibly aimed at explaining how irrevocable trusts fit into the definition of "net family assets." For these reasons, we conclude that the word "income" in section 5.603(b) does not include the principal that initially funded the trust.

Of course, our conclusion that not all disbursements from an SNT are "income" under section 5.603(b) does not resolve the issue at hand. The definition of "annual income" is certainly not limited to income on investments. Rather, it encompasses "all amounts . . . which . . . [g]o to . . . the family head or spouse," id. § 5.609(a)(1), unless those amounts are otherwise "specifically excluded" under the regulations, id. § 5.609(a)(3). So the question remains:  did DeCambre's irrevocable trust

---

[17] We acknowledge the assistance of amici National Academy of Elder Law Attorneys, Inc.; Special Needs Alliance, Inc.; and National Housing Law Project in elaborating this reading of section 5.603(b).

principal, which would have been classified as a "specifically excluded," id., "[l]ump-sum addition[] to family assets," id. § 5.609(c)(3), had it been paid directly to DeCambre, retain or regain that classification despite having first been routed through an SNT?

This question moves us to the BHA's second argument: because the settlement proceeds that composed the trust principal were paid first into the SNT, rather than directly to DeCambre, they never became (or stopped being) excluded lump-sum additions to family assets, and were not otherwise excluded from the broad definition of "annual income." Under the first branch of this argument, the BHA contends that DeCambre's settlement money did not fall into an income exclusion even at the time it entered the SNT. To make this argument, the BHA contends that because the lump-sum exclusion applies only to "[l]ump-sum additions to family assets," id. § 5.609(c)(3) (emphasis supplied), and because, according to the BHA, an irrevocable trust fund "is not considered to be an asset," see id. § 5.603(b), the lump-sum exclusion "should not even apply where the settlement funds received in a lump-sum were immediately placed in a[n] SNT, and thus never became an asset." This argument, though, begs the question: to what extent should funds be classified differently when they are routed through an SNT, and thus sit beyond a tenant's control for a time, than they would have been had they been put directly under the tenant's

control in the first instance? Clearly, HUD decided that one difference was called for in order to prevent inaccessible sums from increasing a tenant's annual income: interest on the principal of an irrevocable trust fund, unlike interest generated by a fund to which the tenant has immediate access, see id. § 5.609(b)(3), counts toward annual income not when it first accrues but rather only once it is distributed. Section 5.603(b) expressly so provides, as we have discussed above. It is hard to imagine, though, that, without expressly so stating, HUD also intended, now to the tenant's detriment, to count toward annual income certain funds that would not have counted toward annual income had they not been routed directly into an irrevocable trust, merely because the tenant who opted for an irrevocable trust received the benefit of these funds only after some delay.

Under the second branch of this argument, the BHA maintains that even if DeCambre's settlement proceeds had the character of a lump-sum addition to family assets when they entered the SNT, they no longer possessed that character once they were disbursed from the SNT. The BHA concedes that the regulations do not expressly address the matter of whether the nature of the fund's original source (here, a set of lump-sum personal injury settlements) loses its controlling relevance after those funds have been routed through an irrevocable trust, such that the funds are excluded from annual income upon disbursement only if they

fall anew into an independent exclusion at the time they are disbursed. The language of the regulations does, however, imply that a fund's declassification as an asset by virtue of its placement in an SNT can be temporary. Specifically, section 5.603(b) states that "the value of [an irrevocable] trust fund will not be considered an asset <u>so long as the fund continues to be held in trust</u>." <u>Id.</u> § 5.603(b) (emphasis supplied). This language reasonably implies that certain irrevocable trust principal may well be considered to be an asset (rather than income) after it no longer "continues to be held in trust." <u>Id.</u> One might therefore fairly reason that DeCambre's interest in her settlement proceeds was an asset that continued to be an asset after its detour through the trust. Indeed, the HUD advisory letter to which we have previously made reference suggests as much: it points out that although irrevocable trust distributions are to count toward annual income, annual income does not include "[l]ump-sum additions to family assets, such as . . . settlement for personal or property losses." Advisory Letter, <u>supra</u> p. 30, at 1-2. The BHA does not explain how an irrevocable trust disbursement can constitute a legal settlement in favor of the trust's own beneficiary unless the origins of the disbursed funds are taken into account.

Absent more guidance to the contrary, we can discern no reason to exclude from annual income (as the regulations clearly

do) lump-sum personal injury settlement proceeds paid directly to a tenant, see id. § 5.609(c)(3), yet not exclude those same proceeds merely because they "[g]o to, or on behalf of" a tenant, id. § 5.609(a)(1), through a trust of which the tenant is the beneficiary. Routing the funds into a trust deprives the tenant of their immediate use. It therefore makes sense that a regulation postpones recognition of earnings on the fund until they are disbursed. Without a reason to think otherwise, one would therefore expect the regulations to treat the principal similarly: while held in trust, an asset remains frozen and inaccessible, and therefore does not have the effect that it would have were it within the tenant's control (i.e., it does not count toward net family assets, see id. § 5.603(b)); once distributed from the trust, an asset is once again accessible, and it therefore does have the effect that it would otherwise have had it not been routed through the trust (i.e., being an asset, it is not counted toward annual income, but it does count toward net family assets). Conversely, if we follow the BHA, then an irrevocable trust becomes a mechanism for transforming assets into income.

We also see a potential for untoward results that neither Congress nor HUD likely intended should we accept the BHA's view. If (as the BHA urges) we were to look only to the character of the funds as they exit the trust without reference to their provenance, the risk of double-counting arises. Suppose, for example, that a

tenant earns wages in Year One that indisputably count toward annual income in Year One. See id. § 5.609(b)(1). Then suppose that, in Year Two, the tenant moves an amount equal to those same wages from her bank account into an irrevocable self-settled spendthrift trust and later receives them as a disbursement from the trust in Year Four. See generally Adam J. Hirsch, Symposium, Fear Not the Asset Protection Trust, 27 Cardozo L. Rev. 2685, 2685–86 (2006) (describing the growing availability of such trusts under state law). On the BHA's logic, as long as the eventual trust disbursements drawn from those wages do not independently fall into a regulatory exclusion, the wages would once again count toward annual income in the year they are spent for the tenant's benefit. Such a reading has little in logic to recommend it.

Trying to cabin the scope of its logic to avoid such results, the BHA moves to its third argument, which maintains that even if passage through an irrevocable trust does not have the potential to convert all assets into income upon disbursement, such passage at least has the potential to convert into income those sums that are originally excluded from annual income only because they fall into the lump-sum exclusion. The BHA contends that the only reason "[l]ump-sum additions to family assets," id. § 5.609(c)(3), are excluded from annual income when first received is to prevent a large, one-off monetary inflow from causing a tenant's income to spike abruptly in a single year, potentially

jeopardizing the tenant's continued participation in the Program. Because periodic disbursements from a trust fund do not have this effect, the BHA argues, the rationale for this regulatory exception does not apply when a settlement is distributed in this way. But this logic does not supply a reason why piecemeal disbursements of what was once a lump sum count toward annual income only if they are made from an irrevocable trust (and not from, say, a bank account or a pile of cash held under a mattress).

Effectively acknowledging that it makes little sense to treat the regulations as allowing certain assets to transform into income only if those assets first pass through an irrevocable trust, the BHA doubles down on its third argument by contending that, even had the settlement funds here been paid directly to DeCambre, her subsequent withdrawals of the funds (from, for example, a bank account) would have counted toward her annual income. Under this interpretation of the regulations, all expenditures made from any reservoir of assets constitute income. Notwithstanding the fact that this is the principal interpretation that the BHA advances on appeal, it offers no reading of the regulations that would compel this counterintuitive conclusion that a tenant's withdrawal or expenditure of a portion of her own assets constitutes an amount that "[g]o[es] to, or on behalf of," the tenant, id. § 5.609(a)(1), within the meaning of the

regulations and that is therefore presumptively included in annual income.

To the contrary, the regulations point in exactly the opposite direction. For example, the regulations provide that "[a]ny withdrawal of cash or assets from an investment will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested by the family." Id. § 5.609(b)(3) (emphasis supplied). Similarly, "[a]ny withdrawal of cash or assets from the operation of a business or profession will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested in the operation by the family." Id. § 5.609(b)(2) (emphasis supplied). In other words, in usual course the withdrawal of an asset from a holding vehicle generates annual income only to the extent that the asset's underlying value has appreciated in the interim; the initial outlay itself retains its character as an asset that does not factor into the annual income calculation, even once withdrawn.[18] So if, as the BHA contends, withdrawals of principal from an irrevocable trust should be treated like the withdrawal of cash or assets from

_____

[18] To the extent that the BHA is contending that, as a matter of policy, tenants who have access to substantial assets, either in normal course or by receipt from a trust, should be required to devote those assets to housing before receiving Section 8 subsidies, it is not for either the BHA or this court to enact such a change in the law.

- 38 -

any other vehicle into which a lump sum has been placed, DeCambre would seem to prevail.

We have also considered the BHA's contention that the HUD advisory letter to which we made earlier reference, see Advisory Letter, supra p. 30, supports this version of the BHA's argument. The BHA points to the letter's statement that "[d]istributions from the trust will be counted when determining annual income." Id. at 1. But the letter also provides that "[a]nnual [i]ncome does not include . . . [l]ump-sum additions to family assets, such as . . . settlement for personal or property losses." Id. at 2. Critically, the letter does not expressly acknowledge the issue before us, and it offers no rationale at all that would favor classifying the disbursements of settlement proceeds from an irrevocable trust differently from how one would classify expenditures of those same funds had the funds not first gone into the trust. Indeed, the BHA official who emailed the letter's language to another BHA official commented: "[HUD's] GUIDANCE??????????????????????????????????" In sum, the letter casts too little light on the question we face to serve as the sort of "fair and considered judgment" of a federal agency, Massachusetts v. Sebelius, 638 F.3d 24, 30 (1st Cir. 2011) (quoting Chase Bank USA, N.A. v. McCoy, 562 U.S. 195, 209 (2011)), that might warrant deference.

Alternatively, the BHA contends that we should defer to the BHA's own reading of the HUD regulations. One might ask: to which of the various readings the BHA presses on appeal should we defer? In any case, we see no basis for deferring to the BHA on how to read the applicable federal regulations. Our usual deference to a federal agency's "construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159 (2000). And this implicit delegation also confers upon a federal agency the authority to interpret the regulations it has promulgated to fill those statutory gaps. See Auer v. Robbins, 519 U.S. 452, 461 (1997). Such deference to a federal agency usually produces nationwide uniformity "without conflict in the Circuits," thus "impart[ing] . . . certainty and predictability to the administrative process." Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2168 n.17 (2012) (quoting Talk Am., Inc. v. Mich. Bell Tel. Co., 564 U.S. 50, 69 (2011) (Scalia, J., concurring)). Such deference also recognizes that a federal agency speaks with some measure of authority on the meaning of a regulation simply by virtue of having authored that regulation. See Auer, 519 U.S. at 461. In contrast, we find no basis for assuming that Congress delegated any authority to the BHA to propound authoritative interpretations of either the

statute or HUD's regulations.  Congress did not authorize the BHA to draft the pertinent regulations, nor does the BHA have a nationwide perspective on implementation of the statute.  See Kenaitze Indian Tribe v. Alaska, 860 F.2d 312, 316 (9th Cir. 1988) (state's interpretation of a federal statute received no deference because the state "lacks the expertise in implementing federal laws and policies and the nationwide perspective characteristic of a federal agency").  And if federal courts were to defer to state agencies' potentially diverging interpretations of federal regulations, such a practice would defeat the aim of interpretive consistency that, at least in part, justifies deference.  Cf., e.g., Orthopaedic Hosp. v. Belshe, 103 F.3d 1491, 1495-96 (9th Cir. 1997) (no deference to state agency's interpretation of federal statute).

The BHA, however, claims that the Fourth Circuit appeared to see the matter differently in Ritter v. Cecil County Office of Housing & Community Development, 33 F.3d 323 (4th Cir. 1994), in which the court found it "appropriate . . . to show some deference to a state agency interpreting regulations under the authority of a federally created program . . . to the extent the agency's rules are not contrary to the . . . regulation," id. at 327-28.  But although the Fourth Circuit has recognized the need to permit state agencies to "draw[] lines in [regulatory] gray areas," id. at 329, its deference appears so far to have been

limited to cases in which the state agency resolves mixed questions of law and fact by applying the federal regulation to a specific factual scenario, see Clark v. Alexander, 85 F.3d 146, 153 (4th Cir. 1996) (deferring to state agency hearing officer's determination of whether a particular individual "could be considered a member of [plaintiff's] family under the federal housing regulations" based on the individual's particular conduct around plaintiff's residence).[19]

We need not decide whether we would adopt the Fourth Circuit's standard were DeCambre challenging a highly fact-bound determination that her specific characteristics brought her within a broadly written regulatory provision.[20] Cf. Lessard v. Wilton-Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 24 (1st Cir. 2008) (mixed questions of law and fact "are handled on a degree-of-deference continuum, and the exact standard of review depends on whether and to what extent a particular determination is law- or fact-dominated"). In this case, the BHA made a purely legal

---

[19] In Ritter itself, the federal agency responsible for promulgating the regulation at issue had affirmatively "approved" the state agency interpretation to which the Fourth Circuit deferred. See Ritter, 33 F.3d at 325.

[20] A deferential standard, for example, might be appropriate were we to reach the question of whether the BHA properly determined that certain of DeCambre's specific trust disbursements did not fall into the regulatory exceptions for medical expenses, 24 C.F.R. § 5.609(c)(4), or "[t]emporary, nonrecurring or sporadic income," id. § 5.609(c)(9). Because we do not reach that branch of DeCambre's argument, we need not express an opinion about it today.

determination that a federal regulation commands a reading that would count all irrevocable trust disbursements to a tenant, or at least all such disbursements that do not independently fall into a regulatory exclusion at the time of disbursement, to be "annual income" upon disbursement. In doing so, the BHA did not purport to rely on local policy considerations uniquely within the ken of its expertise, nor did the BHA draw its categorical conclusion from the sort of careful examination of specific factual circumstances that appellate tribunals lack a comparative institutional advantage in undertaking.[21] Therefore, we find no rationale in this case that would support extending deference to the BHA's interpretation.

We therefore conclude that the BHA improperly counted the distributions from the principal of DeCambre's settlement-funded irrevocable trust toward her annual income. Accordingly, we reverse the district court's judgment on DeCambre's Housing Act claim. Because we reach this conclusion, we need not address

---

[21] We acknowledge that the HUD advisory letter upon which the BHA relies in part states that "[t]he ultimate determination of whether each [SNT] expenditure[] counts towards annual income or falls within an exclusion or deduction is to be made" by the local housing authority. Advisory Letter, supra p. 30, at 2. We understand this statement to be an acknowledgement that local public housing authorities will be best positioned in the first instance to apply HUD's regulations to the facts of any given case and not to be a grant of authority to the public housing authorities to issue definitive, nationally applicable legal pronouncements on the scope of those regulations.

DeCambre's more limited claim that the BHA violated her rights under the Housing Act by failing to exclude certain specific trust distributions from her annual income.[22]   And because this conclusion will require the district court to determine anew what additional proceedings or remedies are required, we vacate the district court's denial of a preliminary injunction and order remanding to the BHA.   Consequently, we dismiss the BHA's cross-appeal of the remand order as moot.   Cf. Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 31 n.31 (1st Cir. 2008).

## IV.  DeCambre's Discrimination Claims

DeCambre argued in the district court and on appeal that the BHA's policy of counting all distributions from SNTs that satisfied the regulatory definition of income at the time of distribution toward annual income would, if sustained, impact disabled individuals unfairly, and that even if such a policy were correct, the BHA acted unlawfully by failing to exclude from her annual income certain specific trust disbursements that went toward her allegedly medically necessary disability-related expenses.   Our ruling rejecting the BHA's interpretation of the applicable regulations would seem to moot DeCambre's argument that an alternative reading would lead to discrimination in the absence

---

[22] Nor need we address DeCambre's contention that the district court erred in taking judicial notice of certain erroneous Section 8 eligibility requirements.

of reasonable accommodations. We therefore express no view concerning the merits of DeCambre's discrimination claims other than to state that the district court on remand may deem them to be moot unless DeCambre demonstrates otherwise.

## V. Conclusion

In summary, we <u>reverse</u> the district court's ruling in favor of the BHA on DeCambre's Section 1983 claim brought under the Housing Act, <u>vacate</u> the denial of a preliminary injunction and the order remanding to the BHA, and <u>remand</u> for the district court to fashion an appropriate remedy. In light of our ruling on DeCambre's Housing Act claim, we <u>vacate</u> the district court's ruling on DeCambre's state and federal discrimination claims, and <u>remand</u> with instructions to dismiss those claims as moot unless DeCambre can demonstrate that they are not. As to the district court's denial of all DeCambre's remaining claims--in particular, her Fourteenth Amendment, breach of lease, and interference with quiet use and enjoyment claims--we <u>affirm</u>. Finally, we <u>dismiss</u> the BHA's cross-appeal as moot. No costs are awarded.