# United States Court of Appeals
## For the First Circuit

Nos. 20-1107, 20-1338

DAHUA TECHNOLOGY USA INC.,

Plaintiff, Appellee/Cross-Appellant,

v.

FENG ZHANG,

Defendant, Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lynch, Lipez, and Barron,
Circuit Judges.

Daniel E. Rosenfeld, with whom Jennifer C. Brown and DLA Piper
LLP were on brief, for appellee/cross-appellant.
Benjamin Flam, with whom Philip J. Gordon and Gordon Law Group
LLP were on brief, for appellant/cross-appellee.

February 17, 2021

**LYNCH**, **Circuit Judge**.  This case involves a contract dispute under Massachusetts law between Dahua Technology USA Inc. ("Dahua") and Feng Zhang, a former employee of Dahua.  Zhang says that Dahua breached its release agreement with him by paying him $680,000 in total instead of $680,000 a month.  Dahua says that the agreement contains a mistake and that Zhang has breached his duty of good faith and fair dealing by trying to take advantage of this mistake.  The district court granted summary judgment in favor of Dahua but did not award it attorneys' fees.  Zhang appeals from the grant of summary judgment.  Dahua cross-appeals from the denial of attorneys' fees.  We vacate the grant of summary judgment because there are material facts in dispute and remand.

## I. Facts

Dahua is an Irvine, California based company with an office in Massachusetts.  It manufactures and sells video surveillance equipment and is the United States subsidiary of Zhejiang Dahua Technology Co., Ltd., a Chinese company.

On November 5, 2015, Dahua offered Zhang the position of Chief Strategy Officer, Vice President, and President of North American and Enterprise Sales.  Dahua's offer to Zhang said that he would be paid $510,000 a year, receive 100,000 shares of Dahua stock on his start date, January 1, 2016, and serve for a term of three years.  It said that if Dahua terminated Zhang for cause (other than illegal conduct or company misconduct), Zhang would be

entitled to payment of his salary through his three-year term. The offer contained no non-compete clause, confidentiality provision, non-disparagement clause, or release of claims. Zhang accepted this offer.

In August 2017, Dahua decided to terminate Zhang. Liquan Fu, the founder and chairman of Dahua, said that Zhang was fired because Dahua's North American business declined under Zhang's leadership and because Zhang had damaged relationships with Dahua's other divisions. The decision was made by a team of senior leaders at Dahua, including Fu and Dahua's then-president and chief executive officer, Li Ke. Dahua's general counsel asked Haiyan Yue, a member of Dahua's internal legal department, to draft a separation agreement for Zhang. On August 23, 2017, Yue asked Cathryn Le Regulski, Dahua's Virginia-based outside counsel, for assistance drafting the agreement. They began working on a draft.

Dahua also drafted a strategy document in preparation for its negotiation with Zhang. One bullet point said that the "baseline" of his severance package should include "[s]alary, bonus and other benefits from the date of termination to the end of [Zhang's] term" and "[a]dditional compensation to entice [Zhang] to release all claims against Dahua." Another said that Zhang "might act as a whistleblower and blow the whistle on vulnerabilities of [Dahua's] products or operations, which may cause damage." It listed specific areas where it was concerned

- 3 -

Zhang could act as a whistleblower: Dahua's market strategy, Dahua's "[g]rey area of sales strategy," and Dahua's "compliance with laws [or] regulations."

In August 2017, Fu travelled from China to Boston for the sole purpose of informing Zhang of his termination and negotiating the specific terms of his separation agreement. When Fu arrived in Boston, Zhang picked him up at the airport and drove him to his hotel. Zhang said that, during the car ride, Fu told him that Dahua was considering replacing him. They agreed to talk more the next day. Because Fu does not speak English, Zhang and Fu spoke in Mandarin Chinese.

The next morning, Zhang met Fu at his hotel. Zhang said that he and Fu discussed Zhang's future role at the company. They agreed that Zhang would leave his current role but stay on as a corporate advisor for two years. They agreed that Zhang would be paid $240,000 a year in this new role. According to Zhang, he was employed as an advisor to the company because Dahua needed his experience, expertise, and knowledge. According to Fu, Dahua did not have much work for Zhang to do and viewed the consulting agreement as compensation for Zhang's termination.

Zhang also said that Fu told him he would "take care of" Zhang's existing contract and company stock, "treat [him] well," and that Zhang would need to sign a new agreement. They did not discuss specific dollar amounts regarding Zhang's compensation for

the time remaining on his employment agreement or the 100,000 shares of company stock he owned. Zhang said Fu then made a long phone call and, when he returned, told Zhang that they were "all set."

Zhang and Fu then went to Dahua's office in Waltham, Massachusetts. Yue and Le Regulski incorporated the consulting agreement Zhang and Fu had discussed into Zhang's separation package. They produced multiple iterations of two documents: a separation agreement and a consulting agreement. At least five different versions of the separation agreement exist in the record, and it is unclear which version Yue and Fu ultimately presented to Zhang.

The terms of the separation agreement changed meaningfully from version to version. One version said Dahua would "pay [Zhang] an amount equal to the value of the appreciation of 100,000 shares of common stock of [Dahua] from January 1, 2017 to August 28, 2017." Another version instead said that Zhang "agreed to relinquish any and all rights that [he has] or may have with regard to the stocks of [Dahua]." At one point, Yue asked Le Regulski if she could include a sentence in the agreement saying that Zhang "will be awarded 100,000 shares of [Dahua] common stock." Zhang says that 100,000 shares of Dahua stock, which is publicly traded, were worth $942,803 in August 2017. There are also emails from Yue to Le Regulski asking her to include

- 5 -

additional terms that do not appear in any of the separation agreements in the record.

Zhang said that in the separation agreement he was given, Dahua offered to pay him $680,000 total for the remaining sixteen months on his employment contract. He also said it contained a sixteen-month non-compete clause, a confidentiality clause, a non-disparagement clause, a release of claims against Dahua, and a paragraph saying that if Zhang breached the agreement, Dahua could claw back all payments it made under the agreement. The versions of the separation agreement in the record contain most of these terms. Zhang also said that in the consulting agreement he rejected, Dahua offered to employ Zhang as an at-will consultant for two years and pay him $240,000 a year.

Zhang refused to sign these agreements. He said he rejected the consulting agreement because Fu had promised him a two-year agreement and he did not want his employment to be at will. He said that he rejected the separation agreement because he was already entitled to $680,000 with no additional restrictions under his original employment agreement with Dahua.[1] Zhang said he never told anyone at Dahua how much money he wanted in exchange for accepting the restrictions in the separation agreement.

_____

[1] In Zhang's original contract, Dahua agreed to pay him $510,000 a year (or $42,500 a month) for three years. Sixteen months remained on his contract, and sixteen months at $42,500 a month is $680,000.

However, he said after he rejected the offer he told Lynette Lv, who worked in human resources at Dahua, that without the confidentiality agreement he would write a business case study based on his time at Dahua and sell it for millions of dollars.

After Zhang rejected the package, Yue and Le Regulski discussed changes to Dahua's offer over the phone. In an email memorializing their conversation, Yue said that Zhang and Fu had agreed "on the spot" that Zhang would remain an employee of the company with the title of senior corporate advisor for two years. Because of this change, Le Regulski said that Zhang would have to sign a release agreement rather than a separation agreement and sent a draft release agreement to Yue.

Unlike the draft separation agreement, the draft release agreement Le Regulski sent included a blank space for Yue to fill in. It read: "[T]he Company agrees to make monthly severance payments to you in the amount of $ _____ for sixteen (16) months." Yue typed "680,000" into this blank space. She said that the wording in the draft release agreement was different than the wording in the draft separation agreement and that she typed "680,000" by mistake. In all versions of the draft separation agreement, the severance clause read: "the Company agrees to make severance payments to you in the form of continuation of your base salary in effect on the Separation Date for sixteen (16) months."

The release agreement included other notable terms. It included a non-compete clause, a non-disparagement clause, a confidentiality clause, and a release of claims against Dahua. Zhang also agreed to surrender all of his rights to Dahua stock, and the agreement gave him the option of accelerating his severance payments by collecting them in a lump sum.

Unlike Zhang's consulting agreement, which chose Massachusetts law, the release agreement chose Virginia law. When asked why Virginia law was chosen, Le Regulski said she did not recall. During the drafting process, Qiang Li, a partner at Le Regulski's law firm, sent Yue and Le Regulski an email asking them if there was "[a]ny reason we are using Virginia law." Neither Yue nor Le Regulski responded. Yue later said that, after receiving Li's email, she realized that she had forgotten to change the choice-of-law provision in the template Le Regulski had sent her.

Yue and Fu presented the release agreement to Zhang. They did not explain any of the changes to him. Zhang said that before signing the agreement he read all of its terms. He did not discuss the new terms with anyone, including Fu or Yue. Fu signed the agreement on behalf of Dahua in front of Zhang. Zhang signed the release after Fu. Fu said he did not read the document before he signed it and did not have it translated from English to Chinese.

Dahua paid Zhang $62,500 a month for the next four months. According to Dahua, the $62,500 reflected $20,000 a month from Zhang's senior consultant role and $42,500 a month (i.e., $680,000 divided by sixteen months) from the release agreement. During this period, Zhang did not tell anyone at Dahua that he was receiving only $62,500 a month instead of the $700,000 a month he believed he was supposed to be receiving under the written terms of his severance package. He said he did not complain to Dahua because Dahua had a history of paying him late. For example, he said that in 2016, Dahua paid him only $200,000 of the $510,000 it owed him and that it did not pay him the remaining $310,000 until 2017.

In November 2017, at Fu's request, Zhang travelled to Beijing. There, Fu paid Zhang 1.6 million yuan (approximately $240,000) in cash. Zhang said that he understood this payment to cover the appreciation on the value of the 100,000 shares of Dahua stock he had received under his 2015 employment agreement.[2] He did not consider it to be full compensation for the stock Dahua had given him in 2015.

---

[2] The documents Zhang signed did not obligate Dahua to make this payment. An earlier, unsigned draft of the separation agreement said that Zhang would be compensated for the appreciation of his stock. The agreement the parties ultimately signed said that Zhang "agree[d] to relinquish any or all rights . . . with regard to the stocks of [Dahua]." Nevertheless, both Zhang and Dahua say that there was an agreement that Zhang would receive a cash payment related to his stock.

In January 2018, Dahua notified Zhang that it was ending its consulting arrangement with him. It sent him a draft separation agreement saying that Dahua would pay him a lump sum of $910,000.[3] Zhang refused to sign the agreement and, under the acceleration clause in the August 2017 release agreement, requested that Dahua pay him the amount they had agreed to. He said that Dahua owed him over $11 million.

## II. Procedural History

Dahua filed a complaint against Zhang on May 31, 2018. It sought a declaratory judgment that the August 2017 agreement was unenforceable and asked the court to reform it because the parties had made a mutual mistake. It also sought damages against Zhang for breaching the contract's implied covenant of good faith and fair dealing. Zhang counterclaimed, alleging that Dahua breached the August 2017 contract.

Zhang filed a motion for summary judgment on May 9, 2019, and Dahua filed its own motion for summary judgment on June 10, 2019. The district court granted Dahua's motion and denied Zhang's. Applying Massachusetts law, it held that there was "no genuine dispute that a unilateral, if not mutual, mistake permeated the 2017 severance agreement" and that Zhang breached the

---

[3] This amount represented the money Dahua says it still owed Zhang under the August 2017 agreement (i.e., $510,000 for the year remaining on the release agreement plus $400,000 for the year and eight months remaining on his consulting agreement).

agreement's implied covenant of good faith and fair dealing. <u>Dahua</u> <u>Tech. USA, Inc.</u> v. <u>Zhang</u>, 433 F. Supp. 3d 41, 47 (D. Mass. 2020). It reformed the release agreement to "provide for a $680,000 total severance payment, in sixteen monthly installments of $42,500." <u>Id.</u> In a later order, it denied Dahua's request for damages in the form of attorneys' fees.

Zhang appeals from the district court's order granting Dahua's motion for summary judgment and denying his own, and Dahua cross-appeals the district court's denial of attorneys' fees.

### III. Analysis

Zhang argues that the district court erred when it applied Massachusetts law instead of Virginia law to the release agreement. He also argues that the district court did not view the evidence in the light most favorable to him and that genuine disputes of fact precluded summary judgment in Dahua's favor.

We review a district court's choice-of-law determination and grant of summary judgment de novo. <u>Robidoux</u> v. <u>Muholland</u>, 642 F.3d 20, 22 (1st Cir. 2011). When, as here, there is "an appeal from cross-motions for summary judgment, the standard does not change; we view each motion separately and draw all reasonable inferences in favor of the respective non-moving party." <u>Roman</u> <u>Cath. Bishop of Springfield</u> v. <u>City of Springfield</u>, 724 F.3d 78, 89 (1st Cir. 2013) (citing <u>OneBeacon Am. Ins. Co.</u> v. <u>Com. Union</u> <u>Assurance Co. of Can.</u>, 684 F.3d 237, 241 (1st Cir. 2012)).

A. Choice of Law

Zhang first argues that, because the release agreement says that Virginia law governs the agreement, the district court should have applied Virginia law. He says that Virginia law is more favorable to him in two ways: (1) it would require Dahua to allege fraud as an element of its unilateral mistake defense; and (2) it does not recognize an independent claim for breach of the agreement's implied duty of good faith and fair dealing.

Because this is a diversity case, we apply Massachusetts's choice-of-law rules. See Levin v. Dalva Bros., Inc., 459 F.3d 68, 73 (1st Cir. 2006). When "the parties have expressed a specific intent as to the governing law, Massachusetts courts will uphold the parties' choice as long as the result is not contrary to public policy." Oxford Glob. Res., LLC v. Hernandez, 106 N.E.3d 556, 564 (Mass. 2018) (quoting Hodas v. Morin, 814 N.E.2d 320, 324-25 (Mass. 2004)). To determine if a choice-of-law provision is against public policy, Massachusetts follows the Restatement (Second) of Conflict of Laws. See id. It will not uphold the parties' choice if: "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy." Restatement (Second) of Conflict of Laws § 187(2) (Am. Law Inst. 1971).

The district court held that the choice-of-law provision was ineffective because Virginia has no substantial relationship to the parties or the transaction. See Dahua, 433 F. Supp. 3d at 45. Zhang says the district court erred in its analysis of § 187(2)(a) because the agreement has a substantial relationship to Virginia and because the court did not consider whether there was another reasonable basis for the agreement's choice of Virginia law. If the court did not err in its conclusion under § 187(2)(a), he does not argue that under normal Massachusetts choice-of-law rules there was any error in applying Massachusetts law.

First, Zhang says that Dahua had a reasonable basis for choosing Virginia law because that term was included in the contract drafted by Dahua. The fact that the release agreement recited Virginia law is no more than a prerequisite to applying § 187. See Restatement (Second) of Conflict of Laws § 187 cmt. a (Am. Law Inst. 1971) ("The rule of this Section is applicable only in situations where it is established to the satisfaction of the forum that the parties have chosen the state of the applicable law."). The fact that the agreement recites Virginia law is not itself a reasonable basis as that term is used under § 187(2)(a). Reading the Restatement as Zhang does would make § 187(2)(a) impossible to satisfy because every recitation in an agreement of choice of law would automatically be reasonable.

The other arguments that there was a substantial relationship to Virginia or reasoned basis for using Virginia law are not supported by the record. Zhang says that Le Regulski gave reasons for Dahua's choice of Virginia law in her deposition. But she only explained that the choice of law "depends on what the circumstances are." She never gave a reason for why the release agreement referenced Virginia law. She said she does not recall whether the term was discussed or why it was included. Next, Zhang says that Li's email asking why the release agreement chose Virginia law shows that the provision was "discussed and considered" and that the fact that Le Regulski is based in Virginia creates a substantial relationship with Virginia. But again, there is no evidence that there was any discussion or consideration of Virginia law. The email -- which neither Le Regulski nor Yue responded to -- instead indicates that Dahua's own lawyers did not know why Virginia law was included and did not choose it because Le Regulski was based in Virginia. Indeed, Yue said that, after receiving Li's email, she learned for the first time that the release agreement referred to Virginia law. She said the only reason the agreement referred to Virginia law was because she forgot to change the template Le Regulski had sent her. Finally, Zhang says that the fact that the consulting agreement chose Massachusetts law and the release agreement chose Virginia law shows that Dahua had a reason for choosing Virginia law in the

release agreement.  But he does not say what that reason was, and this fact is consistent with the only indication in the record of why Dahua chose Virginia law -- Yue's statement that she forgot to change the provision in the release agreement.

Zhang said that he himself had no basis to choose Virginia law.  He does not have any evidence or argument that he wanted Virginia law to apply.  He said that when he was presented with the release agreement, the fact that it said that "Virginia law applies, for [him], . . . doesn't matter."

Where the record evidence shows no substantial relationship to Virginia and no other reasonable basis for the agreement's reference to Virginia law, § 187(2)(a) directs that the agreement's language about Virginia law not be effectuated.

In these circumstances, the diversity court must conduct the choice-of-law analysis of the forum state.  Massachusetts takes a functional approach to choice of law.  Cosme v. Whitin Mach. Works, Inc., 632 N.E.2d 832, 834 (Mass. 1994).  No party argues that if the contract's choice-of-law provision is not enforced, the law of some state other than Massachusetts should apply.  For the reasons stated by the district court, see Dahua, 433 F. Supp. at 45, Massachusetts law governs.

B. Dahua Did Not Waive Its Unilateral Mistake Defense

Next, Zhang argues that Dahua waived its unilateral mistake defense.  Dahua responds that it was Zhang who waived any

- 15 -

such argument that Dahua had waived by not raising it before the district court. We agree with Dahua.

"Courts are entitled to expect represented parties to incorporate all relevant arguments in the papers that directly address a pending motion." Mancini v. City of Providence ex rel. Lombardi, 909 F.3d 32, 46 (1st Cir. 2018) (quoting McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 n.7 (1st Cir. 1991)).

Zhang failed to raise his waiver argument in his opposition to Dahua's motion for summary judgment or in his own motion for summary judgment. Instead, he directly responded to Dahua's unilateral mistake defense in these motions. The only time Zhang argued that the unilateral mistake defense had been waived was at the very end of the district court's hearing on the parties' motions for summary judgment. He devoted only five sentences to the argument and cited no legal authority. In these circumstances, Zhang's argument was not enough to preserve the issue.

C. Disputed Issues of Material Fact Preclude Entry of Summary Judgment in Favor of Dahua or Zhang

Both Dahua and Zhang moved for summary judgment before the district court. Zhang appeals both the district court's grant of Dahua's motion and its denial of his motion. When reviewing cross-motions for summary judgment, "we must decide 'whether either of the parties deserves judgment as a matter of law on facts

that are not disputed.'" Fidelity Co-op. Bank v. Nova Cas. Co., 726 F.3d 31, 36 (1st Cir. 2013) (quoting Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004)). We review each motion independently, see Matusevich v. Middlesex Mut. Assurance Co., 782 F.3d 56, 59 (1st Cir. 2015), and view the record "in the light most favorable to the nonmoving party" when doing so, Donahue v. Fed. Nat'l Mortg. Ass'n, 980 F.3d 204, 207 (1st Cir. 2020).

The contract defenses of mutual mistake and unilateral mistake are common to both parties' motions. Under Massachusetts law, to successfully reform a contract based on a mistake defense, "a party must present full, clear, and decisive proof of mistake." Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 917 (Mass. 1993); see also Nissan Autos. of Marlborough, Inc. v. Glick, 816 N.E.2d 161, 165 (Mass. App. Ct. 2004); LaFleur v. C.C. Pierce Co., 496 N.E.2d 827, 833 n.10 (Mass. 1986) (quoting Kidder v. Greenman, 187 N.E. 42, 48 (Mass. 1933)).

To assert a mutual mistake defense, a party must show that (1) the contract contained a mistake when it was made; (2) the mistake is shared by both parties; (3) the mistake relates to an essential element of the bargain; and (4) the party raising the defense did not bear the risk of mistake. See LaFleur, 496 N.E.2d at 830-31; Restatement (Second) of Contracts § 152 (Am. Law Inst. 1981).

- 17 -

In contrast, asserting a unilateral mistake defense requires a party to show that (1) the contract contained a mistake when it was made; (2) one party made the mistake; (3) the mistake relates to an essential element of the bargain; (4) the party raising the defense did not bear the risk of mistake; and either (5)(a) the effect of the mistake makes the contract unconscionable or (5)(b) the party not raising the defense had reason to know of the mistake or caused the mistake. See Nissan, 816 N.E.2d at 166; Restatement (Second) of Contracts § 153 (Am. Law Inst. 1981).

## 1. The District Court Erred in Granting Summary Judgment to Dahua

First, we address Zhang's appeal of the district court's grant of summary judgment to Dahua. Because Zhang is the non-movant, we view the facts in the light most favorable to him. See Donahue, 980 F.3d at 207. We hold that, on this record, there are at least three triable issues of fact: whether Dahua made a mistake (informing whether any mistake defense is viable), whether Zhang made a mistake (informing whether a mutual mistake defense is viable), and, if only Dahua was mistaken, whether Zhang knew or should have known of Dahua's mistake (informing whether a unilateral mistake defense is viable). Because of these issues of fact, a reasonable jury could conclude that Dahua's unilateral and mutual mistake defenses both fail and could return a verdict in favor of Zhang. See Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986) (holding that summary judgment is not appropriate if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

First, the circumstances of Dahua's negotiation with Zhang could support a verdict in Zhang's favor. Zhang was a high-level executive at Dahua and Dahua took its negotiation with him seriously. The stakes were high enough that Dahua sent its chairman and founder, Fu, from China to the United States to negotiate with Zhang in person. The sole purpose of this trip was to negotiate with Zhang. Indeed, Fu explained that "from the time when I arrived [in] Boston to the time when I . . . left Boston, almost any time, day and night, was spent communicating with Mr. Zhang."

As part of its preparation for this negotiation, Dahua created a document outlining Zhang's negotiating strengths. It understood that it would need to provide "additional compensation" on top of what it owed Zhang under his 2015 contract to get him to sign an agreement releasing his claims against Dahua and containing confidentiality and non-compete clauses. Specifically, Dahua was concerned that Zhang might reveal information that could damage it or that Zhang might serve as a whistleblower on Dahua's sales practices or failure to comply with laws and regulations. Based on Zhang's position at Dahua, a reasonable jury could conclude

that securing Zhang's compliance with the release agreement's restrictive clauses was valuable enough to Dahua that it made no mistake by offering Zhang $680,000 a month. And even if a jury determined that Dahua did make a mistake, it could reasonably conclude that Zhang, believing that the confidentiality and non-compete clauses were important to Dahua, did not make a mistake and neither knew nor should have known that Dahua had made one.

Next, the record is not clear about the terms of the first severance agreement Zhang rejected. The parties agree that Zhang was only ever shown two severance packages -- the one he rejected and the one he signed. But the record contains many versions. Zhang was shown multiple iterations of the separation agreement during his deposition but could not definitively say which version Dahua presented to him on August 28, 2017. These agreements contained different terms governing what compensation, if any, Zhang would receive for his stock. At the time of the negotiation, Zhang had shares of Dahua that he claims were worth approximately $942,803. Under one version, Zhang would surrender all his rights to this stock. Under another, he would receive compensation only for his stock's appreciation. As reflected in an email between Yue and Le Regulski, Dahua may even have considered granting Zhang an additional 100,000 shares of stock. These drafts provide some evidence that Dahua considered terms that varied the value of Zhang's severance package by millions of

dollars. They also raise questions about whether the terms of the agreement Zhang rejected were better or worse than the terms Dahua says he later agreed to. The exact terms of the agreement are relevant to whether Dahua or Zhang were mistaken when they entered the contract. If only Dahua made a mistake, they are also relevant to whether Dahua can successfully assert a unilateral mistake defense because, depending on the terms Zhang rejected, a reasonable jury could conclude that Zhang did not know and should not have known that Dahua made a mistake in its second offer.

Zhang's account of the negotiation provides additional evidence that could support a jury verdict in his favor. He said that he rejected Dahua's original offer because it treated him worse than his 2015 employment agreement. After rejecting the offer, he told a human resources representative that he could make "millions" by writing about his experience at Dahua, an opportunity he says he gave up by agreeing to the confidentiality and non-disparagement terms in the release agreement. Zhang also said that Fu told him that Dahua would "treat [him] well." Whether both parties made a mistake, whether only Dahua made a mistake, and, if so, whether Zhang knew or should have known about it turns in part on Zhang, Fu, and Yue's differing accounts of the negotiation. A trier of fact can assess these accounts "based on credibility and other factors that the district court could not

weigh on summary judgment," Melo v. City of Somerville, 953 F.3d 165, 171 (1st Cir. 2020), and could find in Zhang's favor.

Finally, in the agreement Zhang signed, he gave up all the stock he was entitled to under his original employment agreement. Under Dahua's account of the negotiation, Zhang made a bad deal. Dahua says Zhang -- shortly after rejecting a deal he said treated him unfairly -- agreed to give up stock assertedly worth $942,803 in exchange for a two-year consulting contract (worth $580,000), a release of all his claims against Dahua, and additional non-compete, confidentiality, and other conditions that he would not otherwise be bound by. A reasonable jury could instead conclude that there was no mistake because Dahua increased its offer to Zhang and, unlike in the prior drafts where it adjusted Zhang's compensation via stock, chose to do so by altering his severance pay. A reasonable jury could also conclude that Zhang was not mistaken about the contract he agreed to, defeating Dahua's mutual mistake defense, and that he did not know and should not have known about any mistake Dahua made, defeating Dahua's unilateral mistake defense.

Because of the triable issues of fact on this record that bear on the viability of Dahua's contract defenses, the district court erred when it granted summary judgment in Dahua's favor.

2. The District Court Did Not Err by Denying Zhang's Motion for Summary Judgment

Turning to Zhang's appeal of the district court's denial of his motion for summary judgment, we now view the facts in the light most favorable to Dahua, the non-movant. We hold that a reasonable jury could find that, for the reasons already given, Dahua made a mistake and that it could also find either that Zhang did not know that the agreement he signed said that Dahua would pay him $680,000 a month (allowing Dahua to succeed on its mutual mistake defense) or that, if he did notice this term, he knew or should have known that Dahua had made a mistake (allowing Dahua to succeed on its unilateral mistake defense). Therefore, the district court's denial of Zhang's motion for summary judgment was proper.

Zhang's expectations for Dahua's second severance offer and his behavior after receiving it could allow a reasonable jury to find in Dahua's favor. First, as we have explained, it is unclear from the record how much the initial severance package Dahua presented to Zhang was worth. Some of the severance packages in the record were worth significantly more than others. Taking the facts in the light most favorable to Dahua, a reasonable jury could conclude that, if Zhang noticed that Dahua increased its offer to him, the increase was so large that Zhang either knew or should have known that Dahua had made a mistake. Such a factual

finding would allow Dahua to prevail on its unilateral mistake defense.

A reasonable jury could also conclude that Zhang never even noticed the $680,000 a month term, allowing Dahua to succeed on its mutual mistake defense. After Dahua presented Zhang with its original severance offer, the only specific change Zhang requested was that his consulting arrangement be for a term of two years rather than at will. He never told anyone at Dahua that he wanted $680,000 a month to accept the release agreement's terms and no one at Dahua ever told Zhang that Dahua was increasing the value of his severance pay. Indeed, Zhang says that after seeing the large increase in his severance pay in Dahua's second offer, he never confirmed that Dahua had intended this increase and never discussed any of the agreement's updated terms with Fu or Yue.

Finally, the issues of who was mistaken and, if only Dahua was, whether Zhang knew or should have known that Dahua was making a mistake also turn on Zhang, Fu, and Yue's differing accounts of the severance negotiation. A jury could assess the credibility of the witnesses to resolve these issues and reasonably determine that one of Dahua's mistake defenses succeeds. See id.

On this record, because disputed facts, if resolved in Dahua's favor, could allow either Dahua's mutual or unilateral mistake defense to succeed, denial of summary judgment in Zhang's favor was proper.

D. Dahua's Cross-Appeal

Dahua argues that, after the district court granted its summary judgment motion and held that Zhang breached the release agreement, it should have awarded Dahua attorneys' fees as damages for the breach.  Because we vacate the district court's grant of summary judgment, we dismiss Dahua's cross-appeal as moot.  See DeCambre v. Brookline Hous. Auth., 826 F.3d 1, 20 (1st Cir. 2016) (citing Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 31 n.31 (1st Cir. 2008)).

## IV. Conclusion

The district court's grant of summary judgment in Dahua's favor is vacated, its denial of summary judgment in favor of Zhang is affirmed, and Dahua's cross-appeal is dismissed.  We remand for further proceedings consistent with this opinion.  No costs are awarded.